United States Court of Appeals,

Eleventh Circuit.

No. 95-4744.

Doug RANKIN, Victoria Rankin, Plaintiffs-Appellants, Cross-Appellees,

v.

Mark EVANS, Richard Willie, Sheriff of Palm Beach County, Palm Beach County Sheriff's
Department, Defendants-Appellees, Cross-Appellants.

Jan. 29, 1998.

Appeal from the United States District Court for the Southern District of Florida. (No. 91-8012-CIV-
JAG), Jose A. Gonzalez, Judge.

Before BARKETT, Circuit Judge, KRAVITCH, Senior Circuit Judge, and HARRIS[*], Senior District
Judge.

HARRIS, Senior District Judge:

This case, like some others involving allegations of sexual abuse of a child, inevitably evokes

feelings of compassion for all of the participants involved in the long-running dispute. However,

obviously the issues must be resolved dispassionately.

Plaintiff-appellant Doug Rankin was arrested in late November of 1988 and charged with

the sexual abuse of a child under the age of twelve. Thereafter, not only did a grand jury not indict

him; it affirmatively found that he was "completely innocent." He and his wife, plaintiff-appellant

Victoria Rankin, brought an action against the arresting officer, Deputy Sheriff Mark Evans, and the

Palm Beach County Sheriff's Department under 42 U.S.C. § 1983, and also made a state claim for

false arrest.

At the conclusion of the evidentiary portion of the civil trial, the district judge denied

[*]Honorable Stanley S. Harris, Senior U.S. District Judge for the District of Columbia, sitting
by designation.

defendants' motion for a directed verdict and permitted the case to go to the jury, which returned a substantial verdict for plaintiffs. Thereafter, upon defendants' motion, the district court set aside the verdict on the ground that probable cause for Doug Rankin's arrest and detention had existed as a matter of law. That ruling is before us, as is defendants' cross-appeal of the district court's conditional denial of their motion for a new trial and its denial of their motions for remittitur and to alter or amend the judgment on the state count. We affirm the district court's grant of a JNOV and dismiss the cross-appeal as moot. (In light of the cross-appeal, for clarity we often refer to the parties as plaintiffs and defendants).

I. Factual History[1]

Plaintiffs Doug and Victoria Rankin owned and operated the Sugar Plum School House, a pre-school program located in Lake Worth, Florida. Dr. Martha Brake's three-and-a-half-year-old daughter Amber began attending Sugar Plum on November 7, 1988. On November 21, 1988, Amber made a statement to her mother, who is a child psychologist, indicating that she had been sexually abused. Dr. Brake then made an audio tape of her daughter's statement in which the child again indicated that she had been abused. That evening, Dr. Brake took her daughter to a pediatrician, Dr. Drummond, to be examined for possible evidence of abuse. During the examination, Dr. Drummond found physical signs which were consistent with sexual abuse. The next morning, Dr. Brake went to Amber's prior school—Victory Baptist—and played the tape in an attempt to get Amber

---

[1]In analyzing the factual history, we have viewed all facts in the light most favorable to plaintiffs and have drawn all reasonable inferences in their favor. *See Bailey v. Board of County Comm'rs of Alachua County,* 956 F.2d 1112, 1119 (11th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 58 (1992). However, this presumption in favor of plaintiffs does not apply where no jury could reasonably conclude that the evidence supported a certain factual finding or inference, despite minor conflicts in the record. *Id.* (stating that a "mere scintilla of evidence does not create a jury question; there must be a substantial conflict in evidence to create a jury question").

readmitted to that school. At approximately nine o'clock that morning, Dr. Brake called the sheriff's department to inform it that she had proof that her daughter had been sexually molested. Deputy Mark Evans, who was assigned to the case, called Dr. Brake and scheduled an interview with her and Amber for that morning.

Deputy Evans and a representative from the Florida Department of Health and Rehabilitation Services and Victim's Services (HRS) interviewed Dr. Brake while another officer observed Amber. Dr. Brake informed Evans that: (1) Amber had made a spontaneous statement to her which indicated that she had been molested by a person named Ba Ba Blue; (2) she had heard Amber refer to Doug Rankin as Ba Ba Blue on several occasions and had never heard her refer to anyone else by that name; (3) a teacher had informed her that children frequently called Doug Rankin Baba Loo;[2] (4) Doug Rankin worked at the school, Sugar Plum, which Amber attended; (5) the only men who had had access to Amber in the recent past were Rankin and one of Dr. Brake's coworkers; (6) she had seen Rankin on the playground with the children; (7) Amber had attended Sugar Plum for about two weeks; (8) Amber started exhibiting behavioral changes starting at the end of her first week at the school;[3] (9) Amber had used the age-inappropriate term "boobies" in reference to her chest after starting school at Sugar Plum; (10) Dr. Brake was so disturbed by Amber's behavioral changes that she tried to get her re-enrolled at her prior school, Victory Baptist; (11) Dr. Brake saw Rankin pick Amber up, and Amber hit him in response, on the day that Amber made her initial

---

[2]It is uncontested that Baba Loo was a nickname used for Rankin by the children, and that Amber pronounced this name as Ba Ba Brue or Ba Ba Blue. Accordingly, we use the term "Ba Ba Blue" whenever we refer to Amber's statements regarding Baba Loo. When referring to another party's independent use of the term, we use the term "Baba Loo."

[3]Dr. Brake testified that she told Evans that Amber initially enjoyed school, but that her behavior had changed significantly by the end of the first week. She told Evans that Amber had become more withdrawn, had indicated that she did not want to go to school, had become more clingy, and had begun having nightmares.

statement indicating sexual abuse;  (12) it was unusual for Amber to strike an adult;  (13) Dr. Brake had had an argument with Rankin regarding what she considered to be insufficient supervision of the children;  (14) she had taken Amber to be examined by Dr. Drummond (their pediatrician) the day Amber made her initial statement, and he told Dr. Brake that there was physical evidence consistent with abuse;  and (15) a colleague of hers who was also a child psychologist, Dr. Decharme, had seen Amber on the evening of November 21, 1988, and told Dr. Brake that Amber had indicated that she had been abused.

Dr. Brake also informed Evans that she had made an audiotape of Amber's recounting of her previous statement.  Evans listened to that tape.  On it, Amber stated that Ba Ba Blue had made "a hole in [her] bottom" and that he put "his fingers in [her] bottom and it pinched and it feels bad." She also indicated that, after Ba Ba Blue was finished with her, he sent her to the playground.

Officer Honholz, who had been with Amber during Evans's interview of her mother, informed Evans and Dr. Brake that Amber made a statement to him regarding the abuse.

Deputy Evans then conducted a videotaped interview with Amber in which she again indicated that a man at school named Ba Ba Blue had abused her.  Prior to identifying Ba Ba Blue as her abuser, Amber named two cartoon characters in response to police questioning regarding the identity of her abuser.  Baba Loo is the name of a cartoon character from a video the children watched in school.  Rankin used the term as a general nickname to refer to the children.  The children, including Amber, also referred to Rankin by this nickname.

Amber also made several improbable or inconsistent statements regarding the timing of the abuse.  She indicated that the abuser had used both his hand and a spoon, taken pictures of her, touched her with his genitalia, and had been naked.  She also indicated that the abuse had happened both inside the school and outside on some steps.

Deputy Evans telephoned Dr. Drummond regarding Amber's physical examination. Dr. Drummond told Evans that there were several physical symptoms that could be the result of sexual abuse: (1) a fresh abrasion; (2) an enlarged hymenal opening; and (3) a healed notch on the hymen. Dr. Drummond indicated that the first symptom could be consistent with improper sexual conduct such as rubbing, but that there were other possible causes. Dr. Drummond stated that the hymenal notch and the enlargement of the area suggested some form of limited penetration—possibly digital. Dr. Drummond also noted that the notch to the hymen was at least two to three weeks old.

On the morning of November 23, 1988, with the authorization of his superiors, Evans went to Sugar Plum to arrest Doug Rankin for sexual battery on a child under the age of twelve. Rankin was not there. Evans did not inform anyone at the school of the purpose of his visit, nor did he interview anyone at the school regarding the alleged abuse. Instead, he returned several hours later, when he had been informed Rankin would be present, at which time he arrested Rankin.

During his subsequent interview with police, Rankin repeatedly proclaimed his innocence and informed Evans that he had never been alone with Amber (a fact that he asserted the teachers could corroborate), that he was physically unable to fit on or reach into the playground equipment on which the police stated that the abuse occurred, that Baba Loo was the name of a cartoon character, that he was not the only person at the school who was called Baba Loo, and that Amber had attended the school for only two weeks.

During his interview, Rankin also conceded that he was the only male who worked at the school, that the children referred to him as Baba Loo, that he had access to the entire schoolhouse, and that he had been at school on November 21, 1988. He also made numerous specific comments regarding Amber's personality and behavior during the two weeks she had been at school, even though he stated that there were 120 students at the school and that he had relatively little contact

with the children. Furthermore, he made progressively more critical comments regarding Dr. Brake as the interview progressed.

Following the interrogation, Rankin formally was charged with sexual battery of a child under the age of twelve pursuant to Fla. Stat. 794.011(2). He subsequently was released on bond with no opposition from Deputy Evans. A grand jury later exonerated Rankin, specifically stating that he was "completely innocent."

II. Procedural History

Following those events, plaintiffs Doug Rankin and his wife Victoria filed a complaint asserting both state and federal claims. The claims resolved by the jury at trial were as follows.[4] Count I stated a claim pursuant to 42 U.S.C. § 1983 alleging that defendant Mark Evans, as a Deputy Sheriff of Palm Beach County, while acting under the color of state law, arrested and seized plaintiff Doug Rankin without a warrant or probable cause in violation of the Fourth and Fourteenth Amendments of the United States Constitution. Count II alleged that defendant Richard Wille, as Sheriff of the Palm Beach County Sheriff's Department, acting through its agents and employees, falsely arrested and imprisoned plaintiff Doug Rankin.[5] At trial, defendants made a motion for a

---

[4]It should be noted that Sheriff Richard Wille was originally named as a defendant in Count I, but was dismissed prior to trial. The Sheriff's Department was named as a defendant in both Counts I and II. However, summary judgment was entered in the Department's favor on Count I, and thus it remained as a defendant only in Count II. Richard Wille subsequently was substituted for the Palm Beach County Sheriff's Department in Count II. Accordingly, at trial, Deputy Mark Evans was the defendant in Count I and Richard Wille, as the Sheriff, was the defendant in Count II.

[5]Although Count II alleges both false arrest and false imprisonment, we refer to the claim as one for false arrest because under Florida law "false arrest and false imprisonment are different labels for the same cause of action." *Weissman v. K-Mart Corp.,* 396 So.2d 1164, 1164 n. 1 (Fla. 3d DCA 1981).

directed verdict both at the close of plaintiffs' case and at the close of all evidence.[6]  At neither time did defendants specifically state their grounds for the motion for a directed verdict.  The trial court denied both motions, and the case went to the jury, which found defendants liable on both counts.[7]

On January 4, 1995, defendants filed motions for a judgment notwithstanding the verdict, for remittitur, to alter or amend the judgment on the state count, and alternatively for a new trial. Defendants based their motion for a JNOV on the asserted existence of probable cause for the arrest.[8]  The motion also asserted that defendants were entitled to a JNOV on the § 1983 claim

---

[6]We note that the 1991 Amendments to Rule 50 of the Federal Rules of Civil Procedure changed the terminology used to describe the relevant actions taken.  Instead of using the term "directed verdict" for a motion for a judgment as a matter of law when the motion is made prior to the verdict, and the term "judgment notwithstanding the verdict" when the motion is made after the verdict is returned, Rule 50 now refers to both motions as motions for a judgment as a matter of law.  However, since one issue on appeal turns on the timing of the motion for the judgment as a matter of law, we use the older terms "directed verdict" and "judgment notwithstanding the verdict" for convenience and clarity.

[7]The jury awarded Doug Rankin $1,000,000 for intangible damages, damage to personal reputation, and loss of past income and earning potential.  Victoria Rankin was awarded $500,000 as damages for loss of consortium.  The Rankins also were awarded $500,000 as business damages.

[8]Plaintiffs contend that defendants failed properly to raise probable cause as the ground for a JNOV on the § 1983 claim because they did not assert that ground until their reply to plaintiffs' opposition to the motion for a JNOV. We reject this argument.

On January 4, 1995—the date on which defendants' motions for a JNOV, for remittitur, to alter and amend the judgment on the state claim, and for a new trial were filed—defendants also filed a motion for an extension of time in which to file addenda to those motions.  Confusion as to the district court's position regarding this request for an extension of time prompted the district court to treat defendants' February 28, 1995, reply to plaintiffs' opposition as an addendum to defendants' original motion for a JNOV. *See* March 16, 1995, Order (detailing the procedural history regarding this matter).  The Order explicitly stated that plaintiffs were entitled to respond pursuant to the Local Rules to defendants' February 28, 1995, submission.  Certainly, it was well within the district court's discretion to treat defendants' reply as an addendum to its original motion in an attempt to remedy any procedural confusion resulting from its Orders.  Accordingly, we reject the assertion by plaintiffs that probable cause was not raised in defendants' motion for a JNOV as a ground for relief.

because plaintiffs failed to demonstrate that Deputy Evans acted with deliberate or callous indifference to Doug Rankin's constitutional rights, as required to support a § 1983 claim. On May 15, 1995, the district court granted defendants' motion for a JNOV on both the state and federal claims on the ground that probable cause for Rankin's arrest and detention existed and constitutes an absolute bar to plaintiffs' claims. The Order also conditionally denied defendants' motion for a new trial and denied their other motions as moot.

Plaintiffs appeal the grant of a JNOV in favor of defendants on both counts. Defendants appeal the conditional denial of the motion for a new trial and the denial of their other motions as moot.

III. Analysis

A. The Grant of a JNOV Was Not Procedurally Barred

The first question we decide is whether the district court's grant of a JNOV in favor of defendants was procedurally barred. The Rankins correctly assert that Federal Rule of Civil Procedure 50(b) requires that a party moving for a JNOV first must have made a timely and proper motion for a directed verdict. *See Wilson v. Attaway,* 757 F.2d 1227, 1237 (11th Cir.1985). Federal Rule of Civil Procedure 50(a)(2) states that such a motion "shall specify ... the law and the facts on which the moving party is entitled to the judgment." *See also National Indus., Inc. v. Sharon Steel Corp.,* 781 F.2d 1545, 1548 (11th Cir.1986). The Rankins note that defendants failed to state specifically any ground for their motions for a directed verdict—much less the ground on which the Court later granted a JNOV, *i.e.,* the existence of probable cause. Therefore, the Rankins contend that defendants' motions for a directed verdict did not satisfy the specificity requirement of Rule 50(a)(2), and that defendants' motion for a JNOV should have been denied as technically deficient. *See, e.g., Piesco v. Koch,* 12 F.3d 332, 340-41 (2d Cir.1993) (defendant's motion for a directed

verdict failed to specify any grounds and thus was not sufficiently informative to preserve defendant's right to move for a JNOV); *Purcell v. Seguin State Bank & Trust Co.,* 999 F.2d 950, 956-57 (5th Cir.1993) (issue raised in a JNOV motion that was not specifically raised in motion for a directed verdict at close of evidence held waived); *McCarty v. Pheasant Run, Inc.,* 826 F.2d 1554, 1555-56 (7th Cir.1987) (same).

Defendants argue that a rigid application of Rules 50(b) and 50(a)(2) is inappropriate where motions for a directed verdict were timely made and the judge and opposing counsel were aware of the legal and factual bases of the motion despite the moving party's failure to state them explicitly. *See, e.g., Stewart v. Thigpen,* 730 F.2d 1002, 1006-07 n. 2 (5th Cir.1984) (stating that plaintiff's failure specifically to identify the grounds for his motion for a directed verdict did not preclude a JNOV in his favor where the trial court and defendants had actual notice of the basis of the motion); *Clarke v. O'Connor,* 435 F.2d 104, 113 n. 15 (D.C.Cir.1970) (concluding that although defendant's motion for a directed verdict did not explicitly assert the applicability of the statutory provision on which a JNOV later was based, it provided the court and opposing counsel with sufficient notice to satisfy Rule 50). Defendants assert that the trial court and opposing counsel were aware that defendants' motions for a directed verdict were based upon the ground that probable cause for Rankin's arrest existed as a matter of law and constituted an absolute defense to plaintiffs' claims.

In support of this contention, defendants stress that it was obvious throughout trial that the existence of probable cause was the central issue in the case. Defendants note that on the day before they made their motions for a directed verdict, they submitted a trial memorandum briefing the issue of probable cause. The trial judge referred to this memorandum and specifically alluded to a probable cause case that was discussed therein in denying defendants' motion for a directed verdict at the close of plaintiffs' case. The trial judge subsequently denied defendants' motion for a directed

verdict at the close of all evidence "on the basis previously announced at the close of the plaintiffs' case in chief."  Accordingly, defendants argue, since it was apparent to all involved that the existence of probable cause was the basis for its motions for a directed verdict, the district court did not err in granting defendants' motion for a JNOV on that ground.

This Circuit has looked to the purpose of Rule 50(b) in determining what constitutes a motion for a directed verdict sufficient thereafter to support a JNOV. *See National Indus.,* 781 F.2d at 1549-50 (noting that where Rule 50(b)'s purpose—providing notice to the court and opposing counsel of any deficiencies in the opposing party's case prior to sending it to the jury—has been met, the Circuit "ha[s] taken a liberal view of what constitutes a motion for directed verdict").[9]  *See also Scottish Heritable Trust v. Peat Marwick Main & Co.,* 81 F.3d 606, 610 (5th Cir.) (stating that "[t]echnical noncompliance with Rule 50(b) may be excused in situations in which the purposes of the rule are satisfied"), *cert. denied,* --- U.S. ----, 117 S.Ct. 182, 136 L.Ed.2d 121 (1996);  *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 691 (3rd Cir.1993) (concluding that defendants' motions for a directed verdict were sufficient to support a JNOV where the court and opposing counsel had actual notice of the basis of the motion even though it was only implicitly raised by defendants' motions).  A party is obliged to make a motion for a directed verdict at the close of the evidence as a prerequisite to a motion for JNOV to ensure that neither the court nor the opposing

---

[9]The Rankins cite *Austin-Westshore Constr. Co. v. Federated Dep't Stores, Inc.,* 934 F.2d 1217, 1222-23 (11th Cir.1991), in support of their contention that Rules 50(b) and 50(a)(2) should be strictly applied to bar the grant of a JNOV in this case.  In *Austin,* however, the ground on which the motion for a JNOV was based had never been raised at trial.  Thus, the trial court could not rely upon the standard articulated in *National Industries* in support of a grant of a JNOV because opposing counsel and the trial court did not have actual notice as to any "flaw" in the case prior to sending it to the jury.  Unlike in *Austin,* the grant of a JNOV in this case is justified by the fact that the moving parties substantially complied with the requirements of Rules 50(a)(2) and (b) because the court and opposing counsel unquestionably had actual notice at trial of the ground upon which the JNOV ultimately was granted.

party is "lulled into complacency" concerning the sufficiency of the evidence. *National Indus.,* 781 F.2d at 1549. *See also Scottish Heritable,* 81 F.3d at 610 (stating that "the two basic purposes of [Rule 50(b) ] are "to enable the trial court to re-examine the question of evidentiary sufficiency as a matter of law if the jury returns a verdict contrary to the movant, and to alert the opposing party to the insufficiency before the case is submitted to the jury' ") (internal citation omitted). Requiring a motion for a directed verdict prior to submitting the case to the jury ensures that the court and the opposing party will be alerted to any sufficiency problems at a stage when such deficiencies might be remedied.

The same purpose underlies the specificity requirement of Rule 50(a)(2). Accordingly, where the trial court and all parties actually are aware of the grounds upon which the motion is made, strict enforcement of the specificity requirement of Rule 50(a)(2) is unnecessary to serve the purpose of the rule.

The record shows that the trial court and plaintiffs' counsel were aware that the asserted existence of probable cause formed the basis of defendants' motions for a directed verdict. That issue was the central question in the case; defendants submitted a trial memorandum on that issue on the day prior to making their motions for a directed verdict; and the trial judge referred to that memorandum, and more specifically to a particular probable cause case, in making his rulings on defendants' motions for a directed verdict. Accordingly, we conclude that defendants' motions for a directed verdict were sufficient to support their subsequent motion for a JNOV.

B. Probable Cause as the Ground for the Entry of a JNOV

1. The Relevance of the Arresting Officer's Subjective Belief in the Arrestee's Guilt to the Existence of Probable Cause

We now turn to plaintiffs' argument that Florida law requires an arresting officer to believe subjectively in the guilt of an arrestee in order to have probable cause for the arrest. Under this view

of the law, the Rankins contend that a reasonable jury could have concluded that Deputy Evans did not subjectively believe in Rankin's guilt and, thus, that he did not have probable cause to arrest Rankin. They further argue that such an arrest would have exceeded state authority, thus violating Rankin's Fourth Amendment rights and rendering defendants liable for that violation pursuant to 42 U.S.C. § 1983. Defendants counter that no such subjective belief requirement exists under Florida law. We conclude that neither Florida nor federal law requires that a police officer actually have a subjective belief in the guilt of the person arrested.

This Circuit has concluded that the standard for determining the existence of probable cause is the same under both Florida and federal law—whether " "a reasonable man would have believed [probable cause existed] had he known all of the facts known by the officer.' " *United States v. Ullrich,* 580 F.2d 765, 769 (5th Cir.1978) (quoting *State v. Outten,* 206 So.2d 392, 397 (Fla.1968)).[10] *See also United States v. McDonald,* 606 F.2d 552, 553 n. 1 (5th Cir.1979) (*per curiam* ) (stating that "Florida's standard of probable cause for a lawful arrest is the same as that required by the Fourth Amendment"); *Wright v. State,* 418 So.2d 1087, 1094 (Fla. 1st DCA 1982) (concluding that the Florida standard for probable cause is no more restrictive than the federal standard and is in effect a mirror image of that standard). Furthermore, prior to its adoption of the proposition that the state and federal probable cause standards are identical, this Circuit explicitly rejected the idea that the subjective belief of the arresting officer is relevant to the determination of whether probable cause exists. *See United States v. Clark,* 559 F.2d 420, 425 (5th Cir.) (stating that "even if the officers felt that probable cause was lacking, an objective standard would still be applicable"), *cert. denied,* 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977); *United States v. Resnick,* 455 F.2d

---

[10]All decisions issued by the former Fifth Circuit prior to October 1, 1981, have been adopted as binding precedent for the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc* ).

1127, 1132 (5th Cir.1972) (concluding that probable cause existed and "the scope of the Fourth Amendment is not determined by the subjective conclusion of the law enforcement officer").[11]

---

[11]We here address plaintiffs' citation of several decisions which they contend establish that an officer must subjectively believe that a crime has been committed and that the suspect committed it in order for probable cause to exist. *See Spicy v. City of Miami,* 280 So.2d 419, 421 (Fla.1973) (stating that an officer "must have ... "substantial reason' and must "believe' from observation and evidence at the point of arrest" that the person was guilty); *Osborne v. State,* 87 Fla. 418, 100 So. 365, 366 (1924) (officer has probable cause to arrest "any person whom such officer has reasonable ground to believe, and does believe, has committed any felony"); *City of Hialeah v. Rehm,* 455 So.2d 458, 461 (Fla. 3d DCA 1984) (reversing a directed verdict in favor of defendant on false arrest and imprisonment claims, because "jury issues were presented as to a) whether, when he placed [the suspect] under arrest, [the arresting officer] in fact himself believed that the offense ... had been committed ...;  and b) whether, if so, there was a reasonable basis for that belief in the circumstances he observed"); *Donner v. Hetherington,* 399 So.2d 1011, 1012 (Fla. 3d DCA 1981) (same).

We note that *Osborne* and *Spicy* were decided prior to the Eleventh Circuit authority described in the text above which rejects the proposition that there is a subjective element to a probable cause analysis.  We must therefore presume that this Circuit considered *Osborne* and *Spicy* in the decisions which collectively rejected that proposition.  We are bound by this precedent because "a prior decision of the circuit (panel or en banc) [cannot] be overruled by a panel but only by the court sitting en banc." *Bonner,* 661 F.2d at 1209.

Both *Donner* and *Rehm,* which are state appellate-level decisions decided after the referenced Eleventh Circuit authority, cite *Spicy* as their sole authority for the proposition that there is a subjective element to the state probable cause analysis. *Donner,* 399 So.2d at 1012; *Rehm,* 455 So.2d at 461.  As noted, this Circuit has concluded that *Spicy* does not stand for the proposition for which plaintiffs cite it.

However, even if we were not so bound, we would not conclude that the cases cited by plaintiffs establish that there is a subjective element to the probable cause analysis under Florida law.  Our research indicates that no other Florida appellate jurisdiction has joined the Third District's adoption of an explicit two-part probable cause analysis requiring an officer subjectively to believe that probable cause exists and have a reasonable basis for that subjective belief.  The other jurisdictions appear to rely on an objective standard:  probable cause exists when "the totality of the facts and circumstances within the officer's knowledge would cause a reasonable person to believe that an offense has been committed and that the defendant is the one who committed it." *Revels v. State,* 666 So.2d 213, 215 (Fla. 2d DCA 1995);  *see also Florida Game and Freshwater Fish Comm'n v. Dockery,* 676 So.2d 471, 474 (Fla. 1st DCA 1996);  *Millets v. State,* 660 So.2d 789, 791 (Fla. 4th DCA 1995);  *LeGrand v. Dean,* 564 So.2d 510, 512 (Fla. 5th DCA 1990).  *But see LeGrand,* 564 So.2d at 513 (Griffin, J., specially

Finally, relying on its own precedent dating back to 1973, the Supreme Court recently stated:

"Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."[12]

*Whren v. United States,* 517 U.S. 806, ----, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996).  Thus,

when this Circuit concluded that state and federal probable cause standards are identical, it was

clearly established under federal law that there was no subjective belief requirement.  No subjective

belief requirement exists under either state or federal law.[13]

_____

concurring) (citing *Donner* and *Spicy* for the proposition that an officer must "actually have a belief that a crime was committed and that the people he proposes to arrest perpetrated the crime").  Finally, the Florida Supreme Court again defined the test for probable cause in objective terms after *Donner.  See Blanco v. State,* 452 So.2d 520, 523 (Fla.1984) ("The probable cause standard for a law enforcement officer to make a legal arrest is whether the officer has reasonable grounds to believe the person has committed a felony."), *cert. denied,* 469 U.S. 1181, 105 S.Ct. 940, 83 L.Ed.2d 953 (1985).  Thus, *Donner* and *Rehm* do not represent any significant shift in Florida law that would affect this Circuit's conclusion that the subjective belief of the arresting officer plays no role in a probable cause analysis under either Florida or federal law.

[12]The Court also stated:  "Not only have we never held, outside the context of inventory search or administrative inspection ..., that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment;  but we have repeatedly held and asserted the contrary." *Whren,* 517 U.S. at ----, 116 S.Ct. at 1774;  *see also United States v. Villamonte-Marquez,* 462 U.S. 579, 584 n. 3, 103 S.Ct. 2573, 2577 n. 3, 77 L.Ed.2d 22 (1983) (rejecting the contention that an ulterior motive might strip officers of their legal justification for an otherwise lawful warrantless boarding of a ship);  *Scott v. United States,* 436 U.S. 128, 136-38, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978) (rejecting the contention that the Fourth Amendment required the exclusion of certain wiretap evidence and and accepting the government's position that "[s]ubjective intent alone ... does not make otherwise lawful conduct illegal or unconstitutional");  *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (characterized by *Scott,* 436 U.S. at 136-38, 98 S.Ct. at 1723, as holding that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action").

[13]Plaintiffs also cite *Tillman v. Coley,* 886 F.2d 317, 321 (11th Cir.1989), as providing support for the existence of a subjective element to the probable cause analysis.  In that case we concluded that a reasonable officer would investigate serious doubts regarding the identity of a suspect prior to arrest, and held that no "reasonable law enforcement officer may conclude that ... an arrest [may be] made for the sole purpose of identifying a suspect." *Id.* Plaintiffs' use of this limited holding in support of a subjective belief requirement is unpersuasive in light of Eleventh

## 2. The Existence of Probable Cause

The Rankins assert that the trial court erred in granting a JNOV in favor of defendants because a reasonable jury could have concluded that the arresting officer, Deputy Evans, did not have probable cause to arrest or detain Doug Rankin. Defendants contend that the trial court was correct in ruling that Evans had probable cause to arrest Rankin as a matter of law. We conclude that probable cause to arrest Rankin existed as a matter of law, and, accordingly, we affirm the trial court's grant of a JNOV in favor of defendants.

In determining whether a JNOV was properly granted, we apply the same standard as the district court. *Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989). Resolving all the factual disputes and drawing all logical inferences in favor of the nonmoving party, we determine whether these facts and inferences so strongly favor one party "that reasonable people, in the exercise of impartial judgment, could not arrive at a contrary verdict." *Bailey v. Board of County Comm'rs of Alachua County,* 956 F.2d 1112, 1119 (11th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 58 (1992). If so, the motion was properly granted. We must also keep in mind, however, that a "mere scintilla of evidence does not create a jury question; there must be a substantial conflict in evidence to create a jury question." *Id.*

As noted, the trial court granted a JNOV in favor of defendants on the ground that the arresting officer had probable cause to arrest Rankin as a matter of law. Since probable cause constitutes an absolute bar to both state and § 1983 claims alleging false arrest, the remaining question for us to address is whether the trial court correctly concluded that probable cause did exist as a matter of law. *Ortega v. Christian,* 85 F.3d 1521, 1525 (11th Cir.1996) (probable cause constitutes an absolute bar to a § 1983 claim alleging false arrest); *Bolanos v. Metropolitan Dade*

---

Circuit and Supreme Court precedent.

*County,* 677 So.2d 1005, 1005 (Fla. 3d DCA 1996) ("[P]robable cause is a complete bar to an action for false arrest and false imprisonment.") (*per curiam* ).  Accordingly, "we ... must evaluate [the] facts and inferences according to the legal standard for probable cause." *Bailey,* 956 F.2d. at 1119.

As has been discussed, the standard for determining whether probable cause exists is the same under Florida and federal law. *McDonald,* 606 F.2d at 553 n. 1. In order for probable cause to exist, "an arrest [must] be objectively reasonable under the totality of the circumstances." *Bailey,* 956 F.2d at 1119; *see also State v. Scott,* 641 So.2d 517, 519 (Fla. 3d DCA 1994).  This standard is met when "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Williamson v. Mills,* 65 F.3d 155, 158 (11th Cir.1995); *see also Elliott v. State,* 597 So.2d 916, 918 (Fla. 4th DCA 1992).  "Probable cause requires more than mere suspicion, but does not require convincing proof." *Bailey,* 956 F.2d at 1120; *see also Scott,* 641 So.2d at 519 ("[T]he facts necessary to establish probable cause need not reach the standard of conclusiveness and probability as the facts necessary to support a conviction.").  In determining whether probable cause exists, " "we deal with probabilities ... [which] are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Revels,* 666 So.2d at 215 (quoting *Illinois v. Gates,* 462 U.S. 213, 229-31, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983)).

An arresting officer is required to conduct a reasonable investigation to establish probable cause. *See Tillman,* 886 F.2d at 321; *see also Harris v. Lewis State Bank,* 482 So.2d 1378, 1382 (Fla. 1st DCA 1986) ("Where it would appear to a "cautious man' that further investigation is justified before instituting a proceeding, liability may attach for failure to do so, especially where the information is readily obtainable, or where the accused points out the sources of the

information.").  An officer, however, need not take "every conceivable step ... at whatever cost, to eliminate the possibility of convicting an innocent person." *Tillman,* 886 F.2d at 321; *see also State v. Riehl,* 504 So.2d 798, 800 (Fla. 2d DCA 1987) ("In order to establish the probable cause necessary to make a valid arrest, ... it is not necessary to eliminate all possible defenses.").  Furthermore, once an officer makes an arrest based upon probable cause, he "need not "investigate independently every claim of innocence.' "  *Tillman,* 886 F.2d at 321 (internal citation omitted).  Probable cause is "judged not with clinical detachment but with a common sense view to the realities of normal life." *Marx v. Gumbinner,* 905 F.2d 1503, 1506 (11th Cir.1990) (internal citation omitted);  *see also Revels,* 666 So.2d at 215.

The only difference in the probable cause analysis applicable to the state and federal claims at issue here is which party carried the burden of proving whether probable cause existed.  The existence of probable cause constitutes an affirmative defense to the claims of false arrest and imprisonment under Florida law.  *See Bolanos,* 677 So.2d at 1005 (probable cause bars a state claim for false arrest or false imprisonment);  *DeMarie v. Jefferson Stores, Inc.,* 442 So.2d 1014, 1016 n. 1 (Fla. 3d DCA 1983) ("[T]he existence of probable cause is a part of the defense to a false arrest action which must be shown by the defendant.").  Accordingly, defendants had the burden of demonstrating the existence of probable cause as a defense to the state claim.  However, plaintiffs had the burden of demonstrating the absence of probable cause in order to succeed in their § 1983 claim.  *Evans v. Hightower,* 117 F.3d 1318, 1320 (11th Cir.1997) ("In order to establish a Fourth Amendment violation, [plaintiff] must demonstrate that a seizure occurred and that it was unreasonable.");  *see also Rivas v. Freeman,* 940 F.2d 1491, 1496 (11th Cir.1991) ("To successfully litigate a lawsuit for deprivation of constitutional rights under 42 U.S.C. section 1983, a plaintiff must show violation of a constitutionally protected liberty or property interest and deliberate

indifference to constitutional rights."). We conclude that probable cause existed as a matter of law and that the existence of such probable cause defeats both the federal and state claims.

The Rankins first assert that the evidence on which Deputy Evans relied in making the arrest either exonerated Doug Rankin or was not sufficiently trustworthy or reliable to support a finding of probable cause. They assert that the medical evidence of which Evans was aware compelled the conclusion that Rankin was not Amber's abuser because it suggested that the charged conduct had occurred prior to Rankin's first contact with the child. They also contend that the physical evidence exonerated Rankin because he could not physically have committed the acts of which he was accused in the location identified by the victim. Additionally, the Rankins contend that Rankin's lack of access to Amber defeated probable cause for his arrest, especially in light of the fact that Evans knew that another male, one of Dr. Brake's coworkers, had had access to Amber during a time frame consistent with the medical evidence suggesting penetration.

The Rankins also contend that Evans should not have relied on Amber's or Dr. Brake's statements about possible abuse when determining probable cause. They claim that Amber's statements regarding abuse were unreliable because of: (1) her age; (2) inconsistencies regarding the identity of the abuser, the number of times the abuse occurred, and the location and timing of the abuse; (3) the possibility that Dr. Brake, a child psychologist, concocted the story that Amber spontaneously told her about the abuse and that Dr. Brake's coaching resulted in Amber's subsequent statements; and (4) the possibility that the police officers' questions during their interview with Amber led her into making statements that she would not otherwise have made. They further contend that Evans should have viewed Dr. Brake's statements with considerable skepticism because he should have known that Dr. Brake was biased against Rankin due to their argument regarding the school's supervision of the children under its care. They also seem to suggest that Evans should

have considered the possibility that either Dr. Brake or somebody she was protecting committed the abuse. Accordingly, they conclude that Evans should have placed little weight on Dr. Brake's comments regarding Amber's behavior and statements.

Finally, the Rankins argue that, at the very least, the information available to Evans at the time of the arrest should have created doubts as to the existence of probable cause and should have prompted further investigation. The Rankins claim that Evans should have examined the playground equipment to determine whether Rankin could have abused Amber on the steps of that equipment as her statements indicated. They also argue that Evans should have interviewed the teachers regarding Amber's behavior at school and Rankin's degree of access to Amber. Although the Rankins contend that this investigation should have been done prior to arresting Rankin, they further assert that it certainly should have been done after Rankin raised concerns regarding these issues during his interview with the police. Plaintiffs contend that such additional investigation was especially important here because time was not of the essence in making an arrest since the school was going to be closed over the Thanksgiving holidays, limiting Rankin's access to the children.

Defendants counter that Evans's conclusion that probable cause existed to arrest Rankin was well-supported by the evidence available to him at the time of Rankin's arrest and detention. Defendants note that Evans interviewed Amber, Dr. Brake, and Dr. Drummond, all of whom provided information supporting the conclusion that Rankin had abused Amber.

Defendants also contend that Evans's interviews with Amber and her mother, his conversation with Dr. Drummond, and his interrogation of Rankin in which Rankin made several damaging statements constituted a reasonable investigation and provided trustworthy and reliable information from which he could conclude that probable cause existed both at the time of arrest and during Rankin's subsequent detention. They further contest plaintiffs' assertion that time was not

of the essence in making the arrest. They note that had Rankin not been arrested on the morning of November 23, he would have had access to the children at the school for the entire day.

We conclude that the investigation conducted by Evans was reasonable and that the evidence on which he based his decision to arrest Rankin was sufficient to create probable cause as a matter of law. We also conclude that the statements made by Rankin after his arrest did not defeat the existence of probable cause or necessitate immediate further investigation.

*a. The Medical Evidence*

We now address plaintiffs' assertion that the medical evidence available to Evans precluded the existence of probable cause to arrest Rankin for the crime with which he was charged. The Rankins note that penetration is an element of the crime of sexual abuse of a child under twelve. *See* § 794.011 Fla. Stat. (1987). Resolving all factual disputes in favor of the plaintiffs, we must conclude that Evans knew that the injury suggesting such penetration had been incurred at least two weeks before the date of Dr. Drummond's examination and that Evans knew that Amber had attended Sugar Plum for just two weeks. We also must conclude that Dr. Brake told Evans that Amber had told her that abusive behavior had occurred on November 21, 1988, a date which seemingly conflicts with the medical evidence that penetration (if only partial) had occurred at least two weeks prior to that date.[14] Accordingly, the question to be answered is whether a prudent person faced with such information could reasonably have believed that Rankin committed the offense.

In addition to that information, however, Deputy Evans also knew that Amber had sustained

---

[14]The parties disputed this at trial. Evans testified that Dr. Brake told him that the date on which Amber told her about the incident with Ba Ba Blue was November 21, but that Dr. Brake gave him a time frame of November 7 to November 21 during which the actual incident or incidents of abuse could have occurred. Plaintiffs confronted Evans at trial with his arguably conflicting deposition testimony in which he indicated that Dr. Brake told him that Amber said that the abuse occurred on November 21, 1988. In light of this conflicting evidence, we must accept plaintiffs' assertion as true.

a fresh abrasion within 24 hours of the November 21, 1988, medical examination which could have been caused by a fingering of the genital area. During her videotaped interview, Amber indicated that abusive incidents occurred on more than one occasion. Thus, Amber's statements and the medical evidence both suggested that more than one instance of abuse occurred, and a prudent officer reasonably could have concluded that a single individual, rather than two separate individuals, was responsible for the alleged abuse. Furthermore, an officer reasonably could have concluded that Rankin was that individual.

Evans knew that Amber consistently had called her alleged abuser Ba Ba Blue and repeatedly linked the alleged abuse to the school. He knew that Rankin was the only person whom Amber called by that name. Amber repeatedly referred to her abuser as a "he," and Dr. Brake told Evans that Rankin was the only male who had access to Amber during the approximately two-week period which was consistent with all of the medical evidence.[15] Dr. Brake also informed Deputy Evans that, after Amber started school at Sugar Plum, her behavior and language had changed in ways which Evans knew to be consistent with sexual abuse.

Plaintiffs assert that even if the abuse could have occurred on the first day on which Amber attended Sugar Plum, which would have placed the incident involving penetration within a time frame consistent with Rankin's guilt, Evans knew that Amber had stated that abuse had occurred on November 21, 1988, which was clearly inconsistent with the medical time frame for the act of penetration. However, the relevant question is whether a prudent officer reasonably could have

---

[15]Amber attended Sugar Plum for two weeks, and Dr. Drummond indicated that the injury suggesting penetration was at least two weeks old. Thus, accepting as true that Evans knew of Dr. Drummond's time line, an overlap of approximately a day existed during which a cautious officer reasonably could have concluded that Rankin could have committed the charged offense. We further note that an officer reasonably could have concluded that the time frame given by the doctor was an estimate and not necessarily a strict cut-off point, thus possibly expanding the window of opportunity by a reasonable period of time.

believed that Rankin committed the offense in light of the medical evidence suggesting that any penetration had to have happened significantly before November 21, 1988, and Dr. Brake's statement that Amber indicated that the abuse occurred on November 21, 1988.

In light of the evidence suggesting multiple incidents of abuse, a prudent officer reasonably could have believed that, in recounting her story to her mother, Amber might not have distinguished between penetration and simple fingering or rubbing. Thus, in recounting the abuse she could have conflated the incidents or confused the dates, or, in talking to her mother, she could have been referring to the conduct which may have resulted in the abrasion. A cautious officer, therefore, reasonably could have believed that multiple incidents of abuse occurred and that the abuse with which Rankin was charged occurred within the first few days of school—which was within the medically permissible time frame. Accordingly, a reasonable jury could not have concluded that the medical evidence defeated probable cause to arrest Rankin.

### b. Access

The Rankins next assert that, even if the medical evidence does not conclusively defeat probable cause, Rankin's lack of access to Amber while she was at school does. They contend that, had Evans interviewed any of the teachers before arresting Rankin, he would have realized that Rankin was never alone with Amber and, thus, could not have abused her. Plaintiffs further note that it is uncontested that Rankin informed Evans of his lack of access to Amber during questioning after he was arrested. They thus contend that Evans knew or should have known that Rankin was never alone with Amber and that he therefore lacked the opportunity to have committed the crime charged.

Defendants counter that Deputy Evans knew that Rankin was present at the school during the relevant time frame and that he moved freely throughout the school. Evans also knew that Dr.

Brake had observed what she perceived to be a lack of adequate supervision of the children. Finally, defendants contend that a reasonable officer could have concluded that the abuse—partial penetration by a finger and rubbing of Amber's genitalia—could have occurred with others in the room if the abuser had his body between any other adult and the child and he simply slipped his hand down the front of Amber's pants or skirt.[16]

Additionally, the teachers whom Rankin argues that Evans should have interviewed were employed by Rankin and thus would have been of questionable credibility.[17] A cautious officer certainly could have reasonably concluded that, even if the teachers were to have stated that Rankin had no access to Amber, such testimony would be so undercut by the witnesses' bias in favor of their employer and their own self-interest in asserting that they were always aware of Amber's movements—such supervision being one of their job responsibilities—that it would not defeat the existence of probable cause in light of the other evidence suggesting Rankin's guilt. Finally,

---

[16]The Rankins note that, in Amber's videotaped interview, she indicated that Ba Ba Blue touched her with both a finger and a plastic spoon. The Rankins assert that a reasonable officer could not possibly believe that Rankin could penetrate Amber with a spoon with other adults in the same room, since such an action undoubtedly would have been painful and caused Amber to make some sort of outcry. However, a cautious officer could have reasonably concluded that the facts available to him at the point of arrest supported at least Amber's contention that Rankin digitally penetrated her. Although further investigation may have been required in order to determine whether the spoon incident could be verified, a reasonable officer could conclude that he had sufficient evidence to proceed on the digital penetration allegation and that time was of the essence considering Rankin's position as the owner of a day care center. Furthermore, a prudent officer could reasonably conclude that Amber's statements regarding digital penetration—which she made on several separate occasions and stated in her own words—were more reliable than her single reference to possible penetration by a spoon—which she referred to only in response to a question by Evans.

[17]Rankin also asserts that one of the teachers would have told Evans that she saw Amber rubbing her vagina on November 21. However, we note that a prudent officer who had such information reasonably could have believed that a child would not have rubbed herself so hard as to cause an abrasion. Thus, such information, even had it been credible and had Evans known it, would not have defeated the existence of probable cause.

interviewing those witnesses prior to picking up Rankin might have alerted him to his possible arrest and, conceivably, precipitated his flight. In light of all of these considerations, a reasonable jury could not have concluded that a prudent officer could not have reasonably believed that Rankin had sufficient access to Amber to have committed the crime charged.

The Rankins further assert that the physical evidence contradicted Amber's account of events and that those contradictions defeated probable cause. The Rankins argue that Amber's contention that she was abused by Ba Ba Blue on the steps of playground equipment at the school simply could not have been true because Rankin physically could not have performed the actions she described at that location. They contend that a reasonable jury could have concluded that the playground equipment steps were too small for a man of Rankin's size to enter and that the slats on the sides of the equipment were too narrow to permit him to reach into the equipment from the outside. The Rankins also assert that a reasonable jury could have determined that Evans did not examine the playground equipment to determine whether Amber's account of the abuse was consistent with the physical evidence. Assuming this have been true, the question is whether a prudent officer reasonably could have believed, in light of all the evidence known to him, that Rankin was guilty of sexually abusing Amber.

We conclude that a cautious officer reasonably could have believed that, even if Amber's story was inaccurate as to the precise location of the abuse, the core of her story regarding the abuse and the identity of the abuser was trustworthy and reliable, especially in light of the medical and other evidence corroborating her story. *See Easton v. City of Boulder,* 776 F.2d 1441, 1449-50 (10th Cir.1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986).

Furthermore, a prudent person reasonably could have believed that the abuse happened in the approximate area of the playground equipment, if not actually on it. Amber stated on the

audiotape that, after Ba Ba Blue made "a hole in [her] bottom," he put her "back on the playground." In the videotaped interview, she said that the abuse took place outside the school. In response to a question from Evans asking whether it was on the playground, she said "yeah." In response to the question of whether it was on a piece of a toy, she said "no." She said that the incident took place on the steps. Interpreting the physical evidence in light of the statements by the victim, it would not be unreasonable for a prudent person to conclude that a three-and-a-half-year-old might either unclearly articulate the location of the abuse or conflate the idea of being put back on the playground after being abused with the idea of where the abuse actually occurred. Additionally, since Amber did not actually state that the abuse occurred on the steps of the playground equipment, there is no reason why a reasonable officer would have to have concluded that Rankin's inability to commit the alleged act on the playground equipment obviated probable cause. Finally, we note that Amber stated that the abuse occurred both inside and outside the schoolhouse, so the fact that Rankin apparently could not have abused Amber on the playground equipment does not affect the possibility that he abused her in the schoolhouse. In light of all of the evidence, we conclude that a reasonable jury could not have concluded that Rankin's alleged lack of access to Amber defeated probable cause.

### c. The Victim's Statements

Next, we address the Rankins' contentions that the only information available to Deputy Evans suggesting that Rankin was the perpetrator of any abuse ultimately was based upon statements made by Amber, and that those statements were not sufficiently reliable and trustworthy to support the existence of probable cause. Defendants contend not only that Amber's statements were sufficiently reliable and trustworthy to support probable cause, but also that Evans was prohibited from simply disregarding such statements based upon the age of the victim. We conclude that

evidence other than Amber's statements supported the conclusion that Rankin likely was the perpetrator of the charged conduct. We also conclude that Evans was entitled to rely to a meaningful degree on Amber's statements in determining the existence of probable cause, and that those statements supported probable cause.

As noted, Amber's statements did not constitute the only evidence suggesting that Rankin was the person who had abused her. The medical evidence was consistent with two separate episodes of abuse—partial penetration which dated back at least two weeks prior to November 21, and either rubbing or fingering of the genitalia which occurred within 24 hours of Dr. Drummond's examination of Amber. Dr. Brake indicated to Evans that she and the school staff were the only people with access to Amber during the two-week period covering both potential incidents of abuse.

Furthermore, a cautious person reasonably could have believed that Dr. Brake was unlikely either to have been the abuser or to have been protecting someone else whom she knew to be the abuser since she—at a point at which no one else knew that any abuse might have occurred—told a friend that she thought that Amber had been abused, took her to a pediatrician to have her examined for abuse, and promptly informed the police of the suspected abuse. A prudent person reasonably could have concluded that one who was guilty of, or complicit in, abusive conduct would not spontaneously decide aggressively to volunteer information to people in a position to take prosecutorial action regarding potential abuse and insist that such action be taken.

Thus, having concluded that Dr. Brake was unlikely to have been responsible for the alleged abusive incidents, a cautious person reasonably could have believed that the perpetrator was someone at the school.[18] This conclusion was further supported by Dr. Brake's statement that Amber

---

[18]Although Evans knew that a male coworker of Dr. Brake's had had access to Amber approximately three weeks prior to the medical examination, that person had not had access to her during the two-week period potentially covering the occurrences resulting in both the

started exhibiting behavioral changes within a week of beginning her attendance at Sugar Plum. These behavioral changes included unusual clinginess, an abnormal aversion to attending school, and atypical shyness. A seasoned officer reasonably could have concluded that these behavioral changes were consistent with sexual abuse and linked that abuse to the school.[19]

Having narrowed the class of likely suspects to the school house, information provided by Dr. Brake suggested that Rankin was the guilty party. Dr. Brake told Evans that, on the day Amber informed her of the abuse, she saw Rankin pick up Amber and that Amber hit him. A prudent officer reasonably could have found this information to be relevant to the probable cause determination in two ways: (1) as Evans testified, an abuser often shows a special interest in a child whom he is abusing, and Rankin's particular attention to Amber in a class of a class of approximately 120 might indicate such a special interest; and (2) the hostility Amber demonstrated

---

damage to the hymen and the fresh abrasion.

[19]The Rankins contend that if Evans had interviewed the teachers, they would have told him that Amber exhibited no behavioral changes, appeared to be happy at school, and even started to misbehave at the end of the day when she had to leave school. However, a cautious officer reasonably could have concluded that any potential statements by the teachers regarding Amber's behavior would not have been particularly probative considering their limited experience with Amber, particularly in light of the fact that her mother, who clearly knew her very well, indicated that such changes had occurred.

The Rankins also contend that Evans knew that Amber and her family had just moved, that she had been repeatedly moved to new preschools, and that her mother had been paying a lot of attention to Amber's younger brother because of his severe illness. They argue that—knowing about those family circumstances—a cautious officer would not have given significant weight to any behavioral changes. However, we conclude that a cautious officer reasonably could have believed, in light of the knowledge that Amber had frequently moved to new preschools and that her brother's health problems were apparently chronic, that Amber had faced such strains before and that her mother was presumably aware of her child's typical reactions to such ongoing problems. Dr. Brake, however, had nonetheless concluded that Amber's behavior was unusual and reported that conclusion to Evans. A reasonable officer acting cautiously could have given significant weight to her evaluation of her child's behavior.

towards Rankin by striking him was not typical of her behavior towards adults, as indicated by her mother, suggesting that Rankin had done something to prompt such a reaction.

In addition to this independent evidence linking Rankin to the abuse, Evans relied on Amber's statements to both her mother and the police in determining that probable cause existed to arrest Rankin. As noted above, the essential question regarding Amber's statements is whether they were sufficiently reliable and trustworthy to support a determination of probable cause. We conclude as a matter of law that a prudent person reasonably could have believed that the fundamental information provided by Amber's statements was sufficiently reliable and trustworthy to consider in determining the existence of probable cause.

Generally, an officer is entitled to rely on a victim's criminal complaint as support for probable cause. *See Singer v. Fulton County Sheriff,* 63 F.3d 110, 119 (2d Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996). The Rankins assert that Evans was not entitled to so rely here because the victim's age and inconsistencies rendered her statements unreliable. We conclude that, although a child victim's statements must be evaluated in light of her age, Amber's statements—considered along with the other supporting evidence—were sufficiently reliable and trustworthy at their core to form the basis for probable cause to arrest Rankin. *See Marx,* 905 F.2d at 1506 (indicating that, although a four-year-old's age affected the weight due her statements, the arresting officer could not simply disregard her statements in determining whether probable cause existed); *Myers v. Morris,* 810 F.2d 1437, 1456-57 (8th Cir.), *cert. denied,* 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987); *Easton,* 776 F.2d at 1450-51.

Next, we address the Rankins' contention that Amber never explicitly stated that Rankin or Mr. Doug abused her. Instead, they note that she merely referred to her abuser as Ba Ba Blue. However, they do not dispute that Evans knew at the time of Rankin's arrest that Rankin was

referred to by the children as Baba Loo. They also do not contest that Amber in particular called Rankin Ba Ba Blue, which was her pronunciation of Baba Loo. Amber identified Ba Ba Blue as the culprit in both her first statement regarding the abuse made to her mother and the subsequent audiotaped statement. Dr. Brake told Evans that Amber also had identified her alleged abuser as Ba Ba Blue to Dr. Drummond. Furthermore, in the videotaped interview of Amber, she ultimately responded "Ba Ba Blue" to questions regarding the identity of her abuser.[20] In addition, Amber consistently referred to her abuser as "he," indicating that the offending individual was a male. As noted above, the only people beside Amber's mother who appeared to have access to her were the staff at Sugar Plum. In addition, Amber indicated that all of her teachers were female, suggesting that Rankin was the only male at Sugar Plum (a fact which Rankin subsequently conceded during questioning). Accordingly, we conclude that Amber's statements provided sufficient information for a cautious person reasonably to believe that Amber was abused by someone called Ba Ba Blue, and that other evidence indicated that Ba Ba Blue was Rankin.

The Rankins also assert that inconsistencies in Amber's videotaped statement indicated that

----

[20]The Rankins assert that the videotaped statement in which Amber identified "Ba Ba Blue" as her abuser demonstrates the unreliability of her statements because she initially answered "Donald Duck" and "Pluto" in response to the question of who did the things to her which she described. The Rankins assert that her identification of two cartoon characters as the abusers, followed immediately by her identification of Ba Ba Blue as her abuser, precluded Evans from relying on her statements for probable cause to arrest Rankin. However, a prudent officer reasonably could conclude that Amber was merely playing when she answered "Donald Duck" and "Pluto," but was being serious when she ultimately responded Ba Ba Blue because: (1) she had repeatedly identified Ba Ba Blue as the abuser in past statements and had never before mentioned the first two characters; (2) she actually knew someone who was referred to as Ba Ba Blue, unlike the other characters; (3) she repeatedly referred to the person who abused her as "he" and the person referred to as Ba Ba Blue was a male; and (4) other corroborating evidence was consistent with abuse by the individual identified as Ba Ba Blue. Thus, a cautious officer reasonably could have concluded that Amber, when referring to Ba Ba Blue, was referring to a real person as opposed to a cartoon character. In light of the other evidence, such an officer also reasonably could have concluded that Rankin was Ba Ba Blue.

her statements as a whole were unreliable. For instance, they note that when Amber was questioned regarding the timing of any abusive incidents, she stated that she had been abused "today"—the date of the interview—but not on the day before, the date on which she reported the incidents to her mother and on which Dr. Brake told Evans that Amber had indicated the abuse had occurred.[21] However, an officer as seasoned in the field of child abuse as Deputy Evans reasonably could have discounted Amber's statements regarding the timing of the abuse because of the fact that young children do not have a particularly strong grasp of the concept of time, although they are able to articulate more concrete concepts such as events that have occurred or things that have happened to them.[22]

The Rankins also point to several other comments by Amber which they assert fatally undermine the reliability of her statements.[23] Although we acknowledge that a stronger statement by the victim would be preferable prior to arrest, we cannot conclude that a prudent officer could not have reasonably relied on the fundamental allegation consistently made by Amber: that a male named Ba Ba Blue made a hole in her bottom at school.[24] She made statements to this effect on at

---

[21]The Rankins also note the varying times which Amber gave Dr. Drummond for the dates of the abuse as evidence that Evans should not have relied on Amber's statements. The Rankins, however, have pointed to no evidence indicating that Dr. Drummond relayed that information to Evans.

[22]For example, Dr. Drummond testified that, in his experience, children who were unable to fully grasp temporal concepts were able accurately to describe more concrete events such as physical pain. A police officer such as Evans, with formal training and extensive practical experience in child abuse cases, would be aware of children's difficulties with time, and reasonably could have discounted those inconsistencies.

[23]For instance, they note that Amber stated in the videotaped interview that Dr. Drummond stuck a thermometer in her bottom and that the testimony at trial showed that he did not do so. However, the Rankins point to no evidence indicating that Evans knew or should have known of this inconsistency at the time of the arrest.

[24]The Rankins assert that Amber's assertion that the abuser had stuck a finger in her bottom undercut the reliability of her statement regarding the abuse because it was inconsistent with the

least four separate occasions of which Evans was aware: to her mother, to Dr. Drummond, on audiotape, and to him during the videotaped interview.[25] In light of the medical evidence supporting the conclusion that abuse had occurred, Dr. Brake's observations regarding Amber's behavioral changes, and her statements regarding the limited number of people who had access to Amber during the relevant time period, we conclude that Evans properly relied on Amber's statements in establishing the existence of probable cause to arrest Rankin.[26] *See Marx,* 905 F.2d at 1506; *Myers,* 810 F.2d at 1456-57.

*Conclusion*

In sum, we conclude that the trial court was not procedurally barred by Federal Rule of Civil Procedure 50 from granting a JNOV in favor of defendants on the ground that probable cause existed. Although we note with regret the undoubted hardship caused to plaintiffs by Doug Rankin's arrest and detention, especially in light of his subsequent complete exoneration by the grand jury,

---

medical evidence which showed vaginal penetration, but no anal contact. However, we note that, in the videotaped interview, Amber referred to her genitals as her bottom. We also note that it is not surprising that a three-year old would not have separate words for her vagina and bottom. Accordingly, a reasonable officer could conclude that Amber intended to refer to her vagina.

[25]Defendants assert that Amber also made such statements to Officer Honholz and Dr. Decharme. Plaintiffs assert that a reasonable jury could have concluded that such statements were never made to these individuals. We conclude that a prudent officer reasonably could have relied upon Dr. Brake's assertion that Amber had made such a statement to Dr. Drummond and on Officer's Honholz's representation to Evans and Dr. Brake that Amber had made such a statement to him in evaluating the existence of probable cause. However, even disregarding these additional statements, probable cause existed as a matter of law.

[26]We note that under Fla. Stat. 794.022(1) (West Supp.1990), "[t]he testimony of the victim need not be corroborated in a prosecution under s. 794.011 [commission of a sexual battery of a child under twelve]." However, we do not need to address the question of how this statutory section would apply when the victim is a young child and the statement is merely being used to establish probable cause, rather than as the sole basis for a conviction, because Evans had evidence in addition to Amber's statements which incriminated Rankin at the time of arrest.

we conclude that the district court correctly determined that probable cause existed as a matter of law.  Accordingly, we affirm the district court's grant of a JNOV in favor of defendants and dismiss the cross-appeal as moot.

AFFIRMED.