**Mitchell J. EPSTEIN, and Karen Epstein, his wife, Plaintiff,**

v.

**TOYS–R–US DELAWARE, INC., a foreign corporation, Coral Springs Police Department, a law enforcement agency, City of Coral Springs, a political subdivision of the State of Florida, Karl Milenkovic & Louis Coldros, Defendants.**

No. 02–60057–CIV–GRAHAM.

United States District Court,
S.D. Florida,
Miami Division.

April 14, 2003.

Ralph Lane McGrath, Jr., Benson McGrath Douglas, Fort Lauderdale, FL, John Patrick Contini, John P. Contini & Associates, Fort Lauderdale, FL, for Plaintiff.

**1268**

Cecilia Aulick, Lorenzo Jackson, Jr., Lane Reese Aulick Summers & Field, Coral Gables, FL, Richard Hunt McDuff, Johnson Anselmo Murdoch Burke & George, Fort Lauderdale, FL, Oscar Edmund Marrero, Kevin Patrick O'Connor, Joel L. Shulman, Restani McAllister & Cassetty, Coral Gables, FL, for Defendants.

### ORDER

GRAHAM, District Judge.

**THIS CAUSE** came before the Court upon the Defendant City of Coral Springs's Motion for Summary Judgment (D.E.103); Defendants Milenkovic's and Coldros's Motion for Summary Judgment(D.E.118); Defendant Toys–R–Us's Motion for Summary Judgment (D.E.126); and Plaintiff's Motion for Partial Summary Judgment (D.E.127).

**THE COURT** has considered the motions, the pertinent portions of the record, and is otherwise duly advised in the premises.

### I. *FACTUAL BACKGROUND*

On January 5, 1998, Plaintiff Mitchell Epstein ("Epstein") went to a Toys–R–Us store in Coral Springs, Florida to return a toy. *See* D.E. 107, M. Epstein Depo. at 54. Epstein was told by an employee at the return counter that he could not get a cash refund but could only get "Geoffrey Dollars," a form of store credit. *Id.* at 65–66. Epstein "explained his dilemma" to one of the people working at the return counter, namely that he did not want Geoffrey Dollars because he claimed that the item was defective and there was nothing else in the store that his son wanted. *Id.*

The Toys–R–Us employee advised him that because the receipt indicated that the item had been purchased with Geoffrey Dollars, the refund could only be provided in Geoffrey Dollars. *Id.* at 66. Epstein stated in his deposition testimony that his

demeanor toward the Toys–R–Us employee was "loud, but firm." *Id.* at 67. He requested to speak with a manager. *Id.* at 67, 68.

A few minutes later, another Toys–R–Us employee approached Mitchell Epstein. *Id.* at 68–69. Epstein explained the situation to this person and again was told that he could only receive Geoffrey Dollars. *Id.* at 69. At this point, Epstein stated he was "a little bit frustrated" because he "couldn't convey [his] problem to anybody who would understand." *Id.* at 69. His voice with the second employee was as loud as it had been with the first employee. *Id.* at 69–70.

In response to the second employee advising him that he could only receive Geoffrey Dollars, Mitchell Epstein refused to accept Toys–R–Us's return policy, and informed the store employee that he would take the Geoffrey Dollars, buy small items under one dollar individually and return them one at a time until he got his money back. *Id.* at 71. According to Mitchell Epstein, although the store policy involves Geoffrey *dollars,* "there is no such thing as Geoffrey *change,*" so by purchasing individual items under one dollar and returning them separately, he believed that he could receive his full refund in United States currency. *Id.* at 71–72 (emphasis supplied).

In an effort to execute his plan, Plaintiff then began to purchase birthday candles with Geoffrey Dollars, at either 67 or 79 cents each, and began to return them separately to receive change in U.S. currency. *Id.* at 72–74. After processing two transactions, the Toys–R–Us employee working the return counter declined to continue to refund the candles in separate transactions and indicated that she needed to call the manager. *Id.* at 74. Epstein acknowledges that at this juncture, he was possibly cursing at the employees working at

the return counter. *Id.* at 76. He also "reprimanded" the employees. *Id.* at 77.

Approximately 10 minutes later, Karen Vick, the store manager, approached Epstein. *Id.* at 80. Epstein explained the situation to Ms. Vick. *Id.* at 82. Ms. Vick advised Epstein of the store's return policy, just as the other store employees had, and further advised him that the store would not allow him to purchase and return any more candles for purposes of receiving change in U.S. currency. *Id.* at 83. Epstein acknowledges that he was "slightly agitated" at this point. *Id.* at 83.

Accordingly, Epstein then devised another plan. He decided to approach customers in line and attempt to exchange his Geoffrey Dollars for United States currency. *Id.* at 85–90. There were about eight or nine customers in line at the time, to whom Epstein expressed his displeasure with the return policy. *Id.* at 86–87. Epstein exchanged about $45 in Geoffrey Dollars for United States currency. *Id.* at 90.

Plaintiff admits that Ms. Vick then asked him to leave the store. *Id.* at 94. Epstein refused to leave. *Id.* at 95. Ms. Vick then advised Epstein that she was calling the police. *Id.* at 95. Ms. Vick picked up the telephone and dialed; Epstein heard her say "words to the effect of violent, fear for the safety of my employees and the customers, dangerous big man . . ." *Id.* at 95–96.

Epstein still refused to leave the store, and yelled out that he himself was calling 911 on his cellular telephone. *Id.* at 96. The transcript of Epstein's 911 call reveals the following exchange between Mitchell Epstein ("ME") and the dispatch officer ("DO"):

ME: Well I returned something and they gave me Jeffrey [sic] money. Now I'm asking people that are in the store, my son's shopping.

DO: Uh-huh.

ME: Meanwhile I'm asking people that are buying things if they would buy some of the Jeffrey [sic] money with cash, and they have no problem with it. But the manager is being a real [expletive] and doesn't want me to do the exchange so I can get rid of my Jeffrey dollars that I don't want. So, and I'm not bothering anybody and I'm buying things. I have stuff in my arms that I already purchased that I want to return but they refuse to pay back which is against all policies.

DO: Okay.

ME: I'm not interrupting. I'm not harassing anybody and there's no scene. So they have no business bothering me. They have a real pain in the [expletive] manager that's trying to make a point.

DO: Right, but the whole thing is . . . private property and she can ask you. . . .

ME No it isn't. It is not.

DO: *Yes it is. It is private property.*

ME: *You'll have to pull me out of here then.*

*Id.,* Ex. 1 (emphasis supplied).

Just after Epstein hung up with 911, Officer Coldros arrived. *Id.* at 99. Epstein observed Officer Coldros and Ms. Vick speaking together. *Id.* at 100. About three or four minutes later, Officer Milenkovic arrived and walked up to where Ms. Vick and Officer Coldros were speaking. *Id.* at 100–101. Almost immediately, Epstein moved closer to where the officers were speaking with Ms. Vick. *Id.* at 101. Officer Milenkovic told him to stand by until he was finished with Ms. Vick. D.E. 112, L. Coldros Depo. at 24. Epstein did not obey this request, and stepped away and came back. *Id.* at 28.

Epstein then interrupted the officers' questioning of Ms. Vick, and after Epstein said "excuse me" twice, Officer Milenkovic

directed him to wait elsewhere while they investigated the matter. *Id.* at 102. Epstein, still agitated, failed to obey this lawful request, and again interrupted the officers' investigation with another "excuse me." *Id.* at 102. Epstein stated he did not move when Officer Milenkovic directed him to do so because he was "trying to tell him [the officer] something." *Id.* at 102. Epstein acknowledges that Officer Milenkovic requested Epstein to move several times. *Id.* at 103.

Significantly, Plaintiff admitted to the officers that he had been asked to leave the store and refused to do so. As Plaintiff stated during his deposition, "[t]he white officer says to me—first he takes a step and gets right in my face and said why didn't you leave when the manager told you to. And I looked at him and said, well I'm leaving now." D.E. 107, at 103. He then turned his back to everybody and walked toward the exit. *Id.* at 106.

After about the second step, Epstein stated he felt something brush the back of his left arm. *Id.* at 106. Epstein has no recollection beyond feeling something brush his arm. *Id.* The next thing Epstein recalls is being on the floor while the police struggled to handcuff him. *Id.* at 109, 113.

In Plaintiff's statement of undisputed facts, Plaintiff appears to acknowledge that as he proceeded to walk away from the officers, Officer Coldros advised him that he was under arrest. D.E. 128; D.E. 112, L. Coldros Depo. at 33–34. According to Officer Coldros, up to the point when Epstein was arrested, the store was quiet, except for Epstein's loud shouting and cursing. L. Coldros Depo. at 30–31. Officer Milenkovic similarly described Epstein's conduct as very loud, and also stated that Epstein was also cursing and swearing. K. Milenkovic Depo. at 73.

Epstein was arrested for disorderly conduct in violation of § 509.143 of the Florida Statutes. *Id.* at 75–76. Epstein pled *nolo contendere* to a charge of resisting arrest without violence, and adjudication was withheld. D.E. 107, at 143. Epstein received three months probation, a $300 fine, was ordered to take an anger management class, and was barred from entering any TOYS–R–US store in Broward County for a period of time.

## II. STANDARD OF REVIEW

The purpose of summary judgment is to determine "whether there is a need for trial—whether in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact ..." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court may grant summary judgment only if it appears through pleadings, depositions, admissions and affidavits that there is no "genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56©; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Real Estate Financing v. Resolution Trust Corporation,* 950 F.2d 1540, 1543 (11th Cir.1992); *McGahee v. Northern Propane Gas Co.,* 858 F.2d 1487, 1493 (11th Cir.1988), *cert. den.,* 490 U.S. 1084, 109 S.Ct. 2110, 104 L.Ed.2d 670 (1989). "The party seeking summary judgment bears the exacting burden of demonstrating that there is no genuine dispute as to any material fact in the case." *Clemons v. Dougherty County, Ga.,* 684 F.2d 1365, 1368 (11th Cir.1982) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)). In making this determination, the Court must decide which issues are material. The Supreme Court has stated that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual dis-

putes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## III. *DISCUSSION*

In the Second Amended Complaint, Plaintiff has asserted a variety of federal and state-law claims against Defendants. In Count I, Plaintiffs allege that the officer defendants violated 42 U.S.C. § 1983 in their conduct in arresting Plaintiff, which Plaintiff maintains was made without probable cause, and in the force used to effectuate that arrest. In Count II, Plaintiff asserts a state-law claim against the City of Coral Springs for false arrest/false imprisonment, and asserts an identical state-law claim against the officer defendants in Count III. In Count IV, Plaintiff asserts a state-law claim against the City for battery/unnecessary force, and asserts an identical state-law claim against the officers for battery/excessive force in Count V.

Defendants argue that they are entitled to summary judgment as to the false arrest claims because, as a matter of law, the officers had probable cause to arrest Plaintiff. The officer defendants additionally argue that as to Count I, they are entitled to qualified immunity because they had arguable probable cause to arrest Plaintiff. Defendants also argue that they are entitled to final summary judgment as to the excessive force/battery claims on the ground that any force used by the officers was reasonable under the circumstances and was only that which was necessary to arrest Plaintiff.

Finally, in Count VI, Plaintiff asserts a claim against Toys–R–Us for spoliation of evidence. Plaintiff alleges that Toys–R–Us destroyed or otherwise made unviewable the surveillance videotape of the store premises on the date of the subject incident.

## A. *The False Arrest/False Imprisonment Claims*

■ Defendants move for summary judgment on Plaintiff's false arrest claims on the ground that the officers had probable cause to arrest Plaintiff on January 5, 1998. The Eleventh Circuit has concluded that the standard for determining the existence of probable cause is the same under both Florida and federal law. *Rankin v. Evans*, 133 F.3d 1425, 1433 (11th Cir.1998) (citations omitted). Probable cause to arrest exists if the facts and circumstances are sufficient to warrant a prudent man in believing that the suspect has committed or was committing an offense. *Knight v. Jacobson*, 300 F.3d 1272 (11th Cir.2002). *See also Lee v. Ferraro*, 284 F.3d 1188,-1195 (11th Cir.2002) (the probable cause standard is met when "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing or is about to commit an offense.") (citations omitted).

■ Although probable cause requires more than suspicion, it "does not require convincing proof ... and need not reach the [same] standard of conclusiveness and probability as the facts necessary to support a conviction." *Rankin*, 133 F.3d at 1436. Rather, in determining whether probable cause exists, "we deal with probabilities ... [which] are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at 1435. Indeed, probable cause is "judged not with clinical detachment but with a common sense view to the realities of normal life." *Id.* at 1436. Further, probable cause is based on an objective reasonableness standard, under the totality of the circumstances. *Id.* at 1433–34. Thus, both Flori-

da and federal law reject the concept that the subjective belief of the arresting officer is relevant. *Id.*

■ In addition, in *Lee v. Ferraro,* the Eleventh Circuit explained that "[t]he validity of an arrest does not turn on the offense announced by the officer at the time of the arrest." *Lee,* 284 F.3d at 1195–96. As the court noted, "[w]hen an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest." *Id.* (citations omitted). Thus, if probable cause existed to arrest Plaintiff for *any* offense recognized by state law, Plaintiff cannot prevail on his false arrest claims.

In the instant case, Plaintiff was arrested for disorderly conduct. Florida Statute § 509.143 states in pertinent part:

A law enforcement officer may arrest, either on or off the premises of the licensed establishment and without a warrant, any person the officer has probable cause to believe violated s. 877.03 on the premises of a licensed establishment and, in the course of such violation, created a threat to the life or safety of the person or others.

In turn, Florida Statute § 877.03 states in pertinent part:

Whoever commits such acts as are of a nature to corrupt the public morals, or outrage the sense of public decency, or affect the peace and quiet of persons who may witness them, or engages in brawling or fighting or engage in such conduct as to constitute a breach of the peace or disorderly conduct, shall be guilty of a misdemeanor in the second degree.

Fla. Stat., § 877.03.

■ While "mere words" or epithets are not sufficient to establish probable cause for a violation of this section, conduct which constitutes more than "mere words" or epithets is actionable. For instance, in *Delaney v. State,* 489 So.2d 891 (Fla. 1st DCA 1986), the court affirmed a defendant's conviction under Florida Statute § 877.03. In that case, the defendant was at the scene of a fight between his friend and his friend's landlord. *Id.* at 891. When the police arrived on the scene, the defendant continuously interrupted the police by demanding that the officer listen to his version of the events. *Id.* The defendant attracted attention by becoming loud and abusive. *Id.* In addition, the defendant got in the officer's way. *Id.*

■ The *Delaney* court noted that defendant's conduct constituted more than "mere words," as the evidence demonstrated that the defendant precluded the police officer from investigating the fight by becoming loud and abusive, interrupting the officer's investigation, demanding that the officer take a report from him first, and ignoring the officer's requests to wait his turn. *Id.* at 892. Given these circumstances, the court concluded that this conduct consisted of more than mere words and any arguably "protected" speech; therefore, the officer had probable cause to arrest defendant for disorderly conduct. *Id.; see also Wiltzer v. State,* 756 So.2d 1063 (Fla. 4th DCA 2000) (finding that probable cause existed for disorderly conduct in part because defendant defied the lawful orders of the police officer to leave the premises); *C.L.B. v. State,* 689 So.2d 1171 (Fla. 2d DCA 1997) (defendant's repeated interference with police officer's arrest constituted probable cause for disorderly conduct).[1]

---

1. In addition, in *L.A.T. v. State,* 650 So.2d 214, 218 n. 3 (Fla. 3d DCA 1995), the court specifically noted that *nonverbal* conduct which interferes with a police investigation or arrest can constitute probable cause for disorderly conduct.

Similarly, in this case the Plaintiff's own deposition testimony and the undisputed facts in this case demonstrate that probable cause existed for Plaintiff's arrest. As set forth more fully above, Epstein repeatedly refused to accept the store's return policy concerning store credit, and repeatedly attempted to devise plans to thwart that policy. D.E. 107 at 65–66. Epstein acknowledges that he was loud, was possibly cursing at the employees working at the return counter, and that he "reprimanded" the employees. *Id.* at 76–77. Plaintiff also admits that the store manager asked him to leave the store, and that he plainly refused to leave. *Id.* at 95. The store manager then advised Plaintiff that she was calling the police. *Id.* at 95. Plaintiff still refused to leave, and then yelled out that he himself was calling 911 on his cellular telephone. *Id.* at 96. When Epstein was advised by the 911 dispatch officer that the store was private property and that the store manager may lawfully ask Plaintiff to leave the store, Plaintiff responded to the dispatch officer, "You'll have to pull me out of here then." D.E. 107, Ex. 1.

Just after Epstein hung up with 911, Officer Coldros arrived at the Toys–R–Us and began speaking with Ms. Vick. *Id.* at 100. About three or four minutes later, Officer Milenkovic arrived and walked up to where Ms. Vick and Officer Coldros were speaking. *Id.* at 100–101. Almost immediately, Epstein interrupted their investigation and interview of Ms. Vick, saying "excuse me" twice. Officer Milenkovic then directed Plaintiff to wait elsewhere. *Id.* at 102. It is undisputed that Plaintiff failed to obey Officer Milenkovic's lawful request. *Id.* at 102. Instead, Plaintiff again refused to move and again interrupted the officers' questioning of Ms. Vick. *Id.* at 102. For his part, Epstein claims he did not move when Officer Milenkovic requested because he was "trying to tell him [the officer] something." *Id.* at 102. Ep-

stein himself acknowledges that Officer Milenkovic requested him to move several times. *Id.* at 103..

When Officer Milenkovic asked Plaintiff why he did not leave when requested to do so by Ms. Vick, Plaintiff responded by saying, "Well I'm leaving now." *Id.* at 102–103. Plaintiff then turned his back to everybody and walked toward the exit. *Id.* at 106. After about the second step, Epstein felt something brush the back of his left arm. *Id.* at 106. The next thing Plaintiff remembered is being on the ground, with the officers attempting to handcuff him. *Id.* at 106–113.

Plaintiff ultimately pled no contest to a charge of resisting arrest without violence, and adjudication was withheld. *Id.* at 143. Epstein received three months probation, a $300 fine, was ordered to take an anger management class, and was barred from going into any Toys–R–Us store in Broward County for a period of time. *Id.* at 143, 177.

The Court finds that even when viewing Plaintiff's testimony in the light most favorable to him, it is abundantly clear that based on Plaintiff's own testimony and version of events, Officers Coldros and Milenkovic had probable cause to arrest Mitchell Epstein. Indeed, the undisputed facts in this case reveal more than the mere exchange of words which would be protected by the First Amendment, but words and *conduct* evidencing that Plaintiff refused to obey the lawful requests of police officers, and interrupted and interfered with their investigation of the matter. While Plaintiff conclusorily opines in an affidavit that he did not *intend* to interfere with the investigation, and that he was not disruptive, the question is not whether *Plaintiff* believed he was being disruptive, but whether based on the facts in the record, the *officers* had probable cause to believe that Plaintiff was committing the offense

of disorderly conduct. Here, just like the defendant in *Delaney*, Mitchell Epstein interfered with the police investigation, and refused to obey the lawful requests of the police officers who responded to the store at the behest of the store manager and Plaintiff himself. Accordingly, the Court concludes that there are no genuine disputes of material fact, and that the officers had probable cause to arrest Mitchell Epstein for disorderly conduct.

Further, in addition to the testimony of Plaintiff Mitchell Epstein, the undisputed record otherwise confirms that probable cause existed for Plaintiff's arrest. Several witnesses, including disinterested store customers, testified that Epstein was yelling and cursing during the entire incident and "making a scene." *See, e.g.,* D.E. 108, Faller Depo. at 8–26. Indeed, Epstein was so loud that customers could hear him throughout the store. *Id.* at 26.

In addition, the store manager testified that Epstein had interfered with the officers' investigation. D.E. 111, Vick Depo. at 90–91. As the officers were trying to obtain information from Ms. Vick, Epstein kept coming over and interrupting. *Id.* at 91.

■ Moreover, even if the officers were mistaken about whether there was probable cause for the charge of disorderly conduct, in the Eleventh Circuit an arrest made for an incorrect charge is not illegal if the officer had probable cause to arrest for an independent charge. *See Lee v. Ferraro*, 284 F.3d at 1195–96; *see also Jernigan v. State*, 566 So.2d 39, 40 (Fla. 1st DCA 1990) (citing *Blanding v. State*, 446 So.2d 1135 (Fla. 3d DCA 1984)). In the instant case, the undisputed facts and Plaintiff's own admissions demonstrate that the officers had probable cause to arrest Mitchell Epstein for trespass, in violation of Florida Statute § 810.08(1). Under this statute, a person commits a trespass when he or she remains in a

structure after having been warned by any authorized person to depart. Plaintiff himself testified that the store manager requested Plaintiff leave the store, and Plaintiff refused. D.E. 107. Indeed, the transcript of Plaintiff's 911 call reveals that when the dispatch officer advised Plaintiff that the store manager may properly request Plaintiff leave the store, Plaintiff responded, "You'll have to pull me out of here then." D.E. 107, Ex. 1. Further, Plaintiff committed the offense when he remained in the store, *Jones v. State*, 666 So.2d 960 (Fla. 3d DCA 1996), and admitted the offense to one of the officers when questioned prior to his arrest. As Plaintiff stated during his deposition, "[t]he white officer says to me—first he takes a step and gets right in my face and said why didn't you leave when the manager told you to. And I looked at him and said, well I'm leaving now." D.E. 107, at 103. Accordingly, the Court finds that probable cause existed to arrest Plaintiff for trespass. *See, e.g., State v. Yunker*, 402 So.2d 591 (Fla. 5th DCA 1981).

■ Also, given that Plaintiff pled *nolo contendere* to a charge of resisting arrest without violence in violation of Fla. Stat. § 843.02, Plaintiff's conviction constitutes conclusive proof of probable cause to arrest Plaintiff for that offense. Under Florida law, Epstein's *nolo contendere* plea constitutes a "conviction," regardless of the withhold of adjudication. *See* Fla. Stat. § 960.291(3) (defining "conviction" to include "a guilty or *nolo contendere* plea by a defendant, regardless of adjudication of guilt"); Fla. Stat., § 921.0011(2) (same).

Accordingly, Plaintiff's *nolo contendere* plea is conclusive evidence of the existence of probable cause for the arrest. *See, e.g., Goldstein v. Sabella*, 88 So.2d 910, 912 (Fla.1956) (noting in civil context that "a judgment of conviction is conclusive evidence of probable cause"); *Cameron v.*

*Fogarty,* 806 F.2d 380, 388 (2d Cir.1986), ("where law enforcement officers have made an arrest, the resulting conviction is a defense to a § 1983 action asserting that the arrest was made without probable cause"), *cert. denied,* 481 U.S. 1016, 107 S.Ct. 1894, 95 L.Ed.2d 501 (1987).

Therefore, after considering the case law, the parties' submissions, and Plaintiff's own testimony, the Court concludes that the undisputed facts demonstrate that probable cause existed to arrest Plaintiff for either disorderly conduct, trespass, or resisting arrest without violence, even though ultimately the officers only arrested Plaintiff based on the charge of disorderly conduct.

For these reasons, Defendants are entitled to final summary judgment on Counts II and III, for false arrest/false imprisonment. In addition, to the extent that Count I, Plaintiff's Section 1983 claim, is predicated on a claim of false arrest, the Officer Defendants are also entitled to summary judgment with respect to Count I.

### B. *The Battery/Excessive Force Claims*

■ Pursuant to Florida law, contact incident to an arrest cannot form the basis of a claim for battery. *See Lester v. City of Tavares,* 603 So.2d 18, 19–20 (Fla. 5th DCA 1992); *see also Borges v. City of West Palm Beach,* 1994 WL 397301 (S.D.Fla.1994) (offensive touchings which take place as ordinary incidents of arrest do not give rise to an independent tort of battery). In the instant case, Plaintiff has no memory of how he was arrested, other than feeling something brush up against him after he walked away from the officers' investigation of the matter. D.E. 107, at 106–107, 109, 113. The next thing

he recalled was the officers attempting to handcuff him. *Id.* at 106–07, 109, 113.

While Epstein himself has no memory of the incident, the undisputed record of disinterested witnesses who observed Mitchell Epstein's arrest reveals that the officers acted appropriately under the circumstances. For instance, Caryn Bendetowies was shopping at Toys–R–Us on the evening of the incident. D.E. 106, Deposition of Caryn Bendetowies, at 5. She observed Mitchell Epstein flailing his arms while the officers tried to calm him down. *Id.* at 12. Epstein was speaking loudly. *Id.* at 12. The officers attempted to handcuff Plaintiff, but had difficulty because he was "fighting with them" by trying to push the officers off. *Id.* at 15–16, 35.

Another customer present at the store at the time of the incident, Kim Faller, described Mitchell Epstein's arrest as follows:

Q: Now, at some point, did you see Mitchell on the ground?

A: Yeah, yes.

Q: And did you see how he got there?

A: Yes.

Q: How did that happen?

A: From what I could see, which that, I had a pretty clear shot, he was trying to get away from the cops, and I believe really from his size, he lost his footing, because he was giving them a hard time.

D.E. 108, Faller Depo. at 17–18.[2] Ms. Faller also testified that the officers never pushed, shoved, struck or kicked Mitchell Epstein to the ground. D.E. 108, at 21, 23. Rather, based on the undisputed observations of this witness, the record reveals that Epstein fell because he "basically lost his balance." *Id.* at 21.

---

2. In January 1998, Mitchell Epstein was five feet ten inches tall and weighed 270 pounds.

D.E. 107 at 5–6.

Similarly, the Toys–R–Us employees present that evening testified that Mitchell Epstein physically resisted the officers' attempts to handcuff him. D.E. 110, Ramirez Depo. at 16. Epstein was trying to get out of the officers' grasp. *Id.* at 24. Consistent with the testimony of the store customers, Karen Vick stated in her deposition that Epstein was "fighting [the officers]" as they tried to place the handcuffs on him, and that he tried to push himself away from the officers. *Id.* at 51–52. Once on the ground, Epstein continued to struggle. *Id.* at 55.

In addition, the Use of Force Report offered by Plaintiff in opposition to summary judgment contains the following description of the incident: "While attempting to place Epstein under arrest Epstein resisted and shoved Officer Milenkovic, when subject continued to resist the officers involved used a transporter technique to take Epstein to the ground in order to arrest him. Epstein injured his knee in the process." Plaintiff's Ex. 12.

Plaintiff has failed to point to *any* facts which would dispute that the officers used any more force than was necessary under the circumstances. It is simply not enough to argue that because Plaintiff sustained injuries, the force used was excessive as a matter of law. *See, e.g., Rodriguez v. Farrell*, 280 F.3d 1341, 1352 (11th Cir.2002).

In support of his battery and excessive force claims, Plaintiff merely offers the testimony of a purported expert on "police practices" who appears to opine that the use of any technique to arrest Plaintiff constitutes excessive force. The Court, however, cannot accept such conclusory observations in the face of the overwhelming undisputed *facts* provided by the store customers and employees who witnessed Plaintiff's arrest. These facts make clear that after Plaintiff attempted to leave the scene of an investigation, and shoved the officers and resisted arrest, the officers responded by subduing Plaintiff in order to arrest him. While the Use of Force Report indicates that a "transporter technique" was used to arrest Plaintiff—who weighed 270 pounds and was resisting arrest—Plaintiff has pointed to no *facts* in the record which would indicate or otherwise dispute that the force used in response to Plaintiff's conduct was excessive under the circumstances.

Accordingly, there being no genuine issues of material facts, the Court concludes that the Defendants are entitled to summary judgment with respect to the battery/excessive force claims set forth in Counts IV and V of the Second Amended Complaint. In addition, to the extent that Count I, Plaintiff's Section 1983 claim, is predicated on a claim of excessive force, the Officer Defendants are entitled to summary judgment with respect to Count I.

## C. *Spoliation of Evidence*

Finally, Plaintiff alleges in Count VI that the video surveillance tape of the incident at issue in this case was somehow destroyed or made unviewable by Toys–R–Us. The elements of a claim for negligent destruction of evidence are (1) existence of a potential civil action; (2) a legal or contractual duty to preserve evidence which is relevant to the potential civil action; (3) destruction of that evidence; (4) significant impairment in the ability to prove the lawsuit; (5) a causal relationship between the evidence destruction and the ability to prove the lawsuit; and (6) damages. *See Continental Ins. Co. v. Herman*, 576 So.2d 313, 315 (Fla. 3d DCA 1990), *rev. denied*, 598 So.2d 76 (Fla.1991).

Plaintiff maintains that because Toys–R–Us failed to produce any video of the incident at issue in this case, Toys–R–Us must have "destroyed" any such video tape of the incident or made the video

unviewable. However, the Court having carefully reviewed the record and the parties' submissions, finds that Plaintiff has wholly failed to point to any record evidence which would support its claim that a video tape of the incident ever existed, or that any such video was destroyed by Toys–R–Us. In order to prevail on a claim for the destruction of a videotape, Plaintiff must at a minimum point to some *facts* indicating that such a video exists. Here, Plaintiff has failed to point to *any* facts indicating that a videotape of the incident ever existed. Rather, the record reveals that a surveillance video exists, but simply did not capture the incident in question. Similarly, Plaintiff has failed to point to any facts indicating that even if a video tape of the incident existed, such a video was destroyed or made unviewable by Toys–R–Us.

Moreover, the Court finds that Plaintiff has failed to satisfy the necessary element of showing significant impairment in the ability to prove his case. This case does not present a situation where the absence of a video tape of events significantly impaired Plaintiff's ability to prove his claims, because there was a substantial body of other evidence, including eyewitness evidence, potentially available to Plaintiff to prove his claim. Specifically, Plaintiff concedes that he was provided with sworn statements for at least eleven (11) witnesses at the store on the night the incident occurred. In view of the number of eyewitnesses available to prove the facts in this case, a video tape would have merely constituted one more piece of record evidence in a case involving a substantial (and undisputed) evidentiary record.

Therefore, the Court finds that even assuming any such video existed, Plaintiff cannot prevail on his spoliation of evidence claim because the absence of any videotape of events could not significantly impair Plaintiff's ability to prove his case as a matter of law.

For these reasons, the Court concludes that Defendant Toys–R–Us is entitled to summary judgment with respect to Count VI.

## IV. CONCLUSION

Based on the foregoing, it is

**ORDERED AND ADJUDGED** that Defendant City of Coral Springs's Motion for Summary Judgment (D.E.103) is **GRANTED**. It is further

**ORDERED AND ADJUDGED** that Defendants Milenkovic's and Coldros's Motion for Summary Judgment(D.E.118) is **GRANTED**. It is further

**ORDERED AND ADJUDGED** that Defendant Toys–R–Us's Motion for Summary Judgment (D.E.126) is **GRANTED**. It is further

**ORDERED AND ADJUDGED** that Plaintiff's Motion for Partial Summary Judgment (D.E.127) is **DENIED**. It is further

**ORDERED AND ADJUDGED** that this case is **CLOSED** for administrative purposes, and any remaining pending motions are denied as moot.