ROY B. DALTON JR., United States District Judge
This action arises out of alleged police misconduct following a domestic dispute that resulted in Plaintiff Timothy Allen Davis, Sr. fatally shooting his son. (See Doc. 122 ("Complaint ").) The Court previously granted Defendant City of Apopka's ("City ") motion to dismiss (Doc. 128) and dismissed all of Plaintiff's claims against the City. (Doc. 133 ("MTD Order ").) Plaintiff then appealed the MTD Order to the U.S. Court of Appeals for the Eleventh Circuit, which affirmed in part, vacated in part, and remanded ("Opinion "). Davis v. City of Apopka , 734 F. App'x 616 (11th Cir. 2018).
In its Opinion, the Eleventh Circuit pointed out at least two clear errors this Court committed: First, the failure to appreciate Plaintiff's allegations that the City's Chief of Police Robert Manley ("Chief Manley ") was a final policymaker for purposes of 42 U.S.C. § 1983, and by personally ordering the alleged unlawful search of Plaintiff's home, this satisfied the requirements for Monell liability on the part of the City to state a claim for the unconstitutional search of Plaintiff's home. See id. at 619-20. Second, application of the "arguable probable cause" standard to evaluate the sufficiency of Plaintiff's false arrest allegations against the City instead of the correct "actual probable cause" standard. See id. at 620-22. With these errors corrected, the case is now back with instruction to re-examine the sufficiency of Plaintiff's Complaint applying the "actual probable cause" standard in light of Florida's "Stand Your Ground" law, Florida Statutes §§ 776.012 and 776.032. Id. at 619. This Order follows.
I. BACKGROUND
A. Plaintiff's Allegations
Turning again to the plausible allegations in Plaintiff's Complaint, accepted as true, the Court finds that the relevant *1370 facts are as follows:[1]
1. The Altercations
In October 2011, Plaintiff resided in a home with his family-his wife Tarsha Davis ("Mrs. Davis" ), a nine-year-old daughter ("Minor Daughter "), a ten-year-old son ("Minor Son "), and twenty-two-year-old Timothy Allen Davis, II ("Timmy "). (Doc. 122, ¶¶ 21, 22.) Timmy had recently returned to the home after leaving college, where he had played football. (Id. ) Timmy weighed approximately 280 pounds, stood 6'1? tall, and was the father of a young child ("Child "). (Id. )
At the conclusion of a multi-day visit between Timmy and the Child, the Child's mother ("Mother ") arrived at the home to retrieve the Child on October 1, 2011. (Id. ¶¶ 22, 23.) Timmy refused to surrender the Child to the Mother, a dispute ensued, and Plaintiff attempted to reason with Timmy. (Id. ¶¶ 24, 25.) While Timmy argued with Plaintiff, Mrs. Davis placed the Child in the Mother's car. (Id. ¶¶ 26-27.) This action allegedly incensed Timmy, who "charged after Mrs. Davis, yelling and cursing her." (Id. ) To prevent physical harm to Mrs. Davis and the Mother, Plaintiff intervened, and Timmy "walked off down the street" after he threatened to "beat" Plaintiff. (See id. )
Approximately fifteen minutes after the initial altercation, Timmy returned to the home and was advised by Plaintiff and Mrs. Davis that he had to "move out." (Id. ¶ 29.) Timmy responded by going upstairs "angrily" and breaking down in tears. (Id. ) Plaintiff-who was on his way to join his Minor Daughter outside-went upstairs to "calm Timmy down." (Id. ¶ 30.) Timmy was not calmed; rather, he yelled at Plaintiff and "brutally attacked" him by " head-butt[ing]," "football-tackl[ing]," and "slamming" Plaintiff to the tile floor in the upstairs bathroom. (Id. ¶ 31.) Timmy then straddled a "completely defenseless" Plaintiff and repeatedly punched him in the face until Plaintiff bled. (Id. ¶ 32.) During this attack, Plaintiff's head struck the toilet, he landed on the back of his head, his "eyeglasses" were broken and tossed from his face, and his knees were severely injured. (Id. ¶¶ 31-32.)
Mrs. Davis heard this second altercation, ran upstairs, attempted to pull-then eventually coaxed-Timmy off Plaintiff, and finally assisted Plaintiff off the bathroom floor. (Id. ¶¶ 33-34.) Visibly bruised and swollen around his eyes, jaw, and lips, Plaintiff instructed Mrs. Davis to "call the paramedics for his severely injured knees" and face. (Id. ¶¶ 35, 36, 49.) Attempting to distance himself from Timmy and "avoid continued violence," Plaintiff then stumbled downstairs to sit and "wait for the paramedics." (Id. ) Timmy allegedly followed Plaintiff downstairs, so Plaintiff walked to the garage to get away from Timmy. (Id. ¶¶ 36-37.) Because Timmy continued to follow him and was "evidently enraged," Plaintiff then "limped out of the garage" to the driveway where his car was parked. (Id. ¶¶ 37-39.)
Hoping that the mere sight of a firearm "would scare [Timmy] from attacking him again," Plaintiff retrieved a firearm from his car. (Id. ¶ 39.) From less than ten yards away, Plaintiff observed Timmy pace back and forth inside the garage, remove his sweatshirt, throw it to the ground in a *1371 "fighting gesture," and then walk "aggressively" toward Plaintiff. (Id. ¶ 40.) Panicked, Plaintiff fired a shot in Timmy's direction to "scare him off," but "Timmy continued to advance toward" him. (Id. ¶ 41.) In "self-defense" Plaintiff fired again, and the second shot struck Timmy in the chest. (Id. ¶ 42.) Plaintiff then saw "blood coming from Timmy's upper chest area." (Id. )
Plaintiff called to Mrs. Davis for help and attempted to escort Timmy to Plaintiff's car for transport to the hospital; however, when they neared the car, "Timmy collapsed to the ground." (Id. ¶¶ 43, 44, 48, 53.) Timmy's collapse caused Plaintiff's injured knees to buckle, and Plaintiff "lost his balance," fell on top of Timmy, and was "unable to move because of his injured knees." (Id. ) Mrs. Davis then called 9-1-1 to report Plaintiff's "confrontation with" Timmy where "she believed" Plaintiff had "shot." (Id. ¶¶ 45, 46.) Some of Plaintiff's neighbors-who came to the home in response to the loud noises-allegedly witnessed Plaintiff's position on top of Timmy and the "visible injuries" to Plaintiff's face. (Id. )
2. Police Response
A few minutes after Mrs. Davis's 9-1-1 call, Officers Mark Creaser and Rafael Baez of the Apopka Police Department ("APD ") arrived at the home, followed a few minutes later by Chief Manley. (See id. ¶¶ 12, 18, 19, 47.) Upon inquiry by Officer Creaser, Plaintiff-still immobilized on top of Timmy-advised that he shot Timmy "because [he] beat me up and kept coming at me" and that the gun was in the front pocket of Plaintiff's pants. (See id. ¶¶ 51, 54, 55.) Officer Creaser then "handcuffed Plaintiff and recovered the gun." (See id. ¶¶ 56, 93, 95, 96.)
At the direction of Chief Manley: (a) Officers Creaser and Baez lifted Plaintiff up and took him to the garage; and (b) Timmy, Mrs. Davis, and the Minor Daughter were transported to the Orlando Regional Medical Center ("ORMC "), where Timmy died at 12:36 a.m. on October 2, 2011. (See id. ¶¶ 64, 114.) Meanwhile, Plaintiff was transported to a different hospital ("FHA "), again at Chief Manley's direction, where Plaintiff remained handcuffed, "under guard," and ignorant of the fact that Timmy was deceased for almost two hours. (Id. ¶¶ 58-60, 62, 63, 87, 107, 141.)
While Plaintiff and Timmy were hospitalized, and Mrs. Davis and the Minor Daughter were at ORMC, the individual Defendants allegedly: (1) conducted a warrantless and illegal search of the home and selectively seized evidence ("Warrantless Search ") (see id. ¶¶ 67, 73-80); (2) edited videotape evidence in an attempt to conceal the warrantless search of Plaintiff's home ("Edited Search Tape ") (see id. ¶¶ 76-78); and (3) obtained a search warrant for Plaintiff's home based on Detective Matthew Reindhart's false statements ("False Warrant ") (see id. ¶¶ 82-85).
After Timmy died but before Plaintiff was informed of his death, Plaintiff alleges several other instances of misconduct. First, Officer Creaser advised Plaintiff that he was "under arrest" at FHA for "Attempted First Degree Murder"[2] ("False Charge Statement "). (See id. ¶¶ 91-93, 95-97, 100.) Then, without providing Plaintiff Miranda warnings or advising him that Timmy was dead, another officer, Detective Andrew Parkinson, interrogated Plaintiff at FHA and learned the circumstances that explained Timmy's *1372 violence and established that the shooting was justified ("Parkinson Interrogation "). (See id. ¶¶ 98, 108-26, 129-30; see also id. ¶ 15.) Last, Detective Parkinson urged Plaintiff-with the impossible promise of visiting Timmy-to record a statement that improperly cast Plaintiff as Timmy's murderer and omitted the exculpatory facts and circumstances ("Recorded Statement "). (See id. ) The individual Defendants then erased portions of the Recorded Statement that revealed the individual Defendants' improper manipulation of Plaintiff. (See id. ¶ 127.)
Plaintiff remained hospitalized and underwent knee surgery as a result of the altercations, and he was discharged by October 7, 2011. (Id. ¶¶ 141-42.) By the time of his discharge, the individual Defendants allegedly knew that Plaintiff had acted in self-defense and no reasonable officer could have concluded that probable cause existed to charge Plaintiff for the murder of Timmy. (See id. ¶¶ 140-42, 147-49, 152.) Nonetheless, the individual Defendants had Plaintiff transported to the Orange County Jail ("Jail Transport ") and kept him confined there until October 22, 2011 ("Initial Confinement "). (Id. ¶¶ 142-43, 146-48.) Plaintiff further alleges that Chief Manley did not allow Plaintiff to attend Timmy's funeral on October 8, 2011, delayed Plaintiff's release on bond, and unjustifiably had Plaintiff detained to his home until February 2013, when Plaintiff was acquitted of the murder charge in the Florida state criminal proceedings. (Id. ¶¶ 143, 146-49, 152.)
3. The Plan
Plaintiff alleges that Defendants devised a plan in the front yard of his home on the day of the shooting to improperly charge and prosecute Plaintiff for Timmy's murder even though any reasonable officer responding to the shooting would have concluded that Plaintiff was an innocent victim of domestic violence who lawfully shot Timmy in self-defense ("Plan "). (See id. ¶¶ 13, 14, 16, 17, 68.) According to Plaintiff, the Plan originated from Chief Manley's "deep-rooted animus" against Plaintiff and was carried out by the individual Defendants who refused to conduct "a Stand Your Ground investigation" and deliberately ignored APD's established domestic violence investigation protocol and procedures by:
(1) declining "to classify [Plaintiff] as a victim of domestic violence" even though Officers Creaser and Baez could see that Plaintiff had suffered severe physical injuries as a result of Timmy's relentless violent attack in the home (id. ¶¶ 21-22, 68-71, 86, 99, 102);
(2) refusing to photograph Plaintiff's injuries (id. ¶¶ 69-70, 99, 105, 106);
(3) conducting the Warrantless Search, editing the Search Tape, and obtaining the False Warrant (id. ¶¶ 67, 73-80, 82-85);
(4) arresting Plaintiff before interviewing available witnesses, such as Timmy, Mrs. Davis, Minor Daughter, and Plaintiff's neighbors (see id. ¶¶ 99-104; see also id. ¶¶ 133, 134, 137, 140);
(5) failing to advise Plaintiff of his Miranda rights "upon his arrest" or before conducting improper custodial interrogations of Plaintiff (id. ¶¶ 98, 118, 122-24); and
(6) obtaining the Recorded Statement by manipulating Plaintiff with the False Charge Statement and during the Parkinson Interrogation, and then improperly editing the Recorded Statement (id. ¶¶ 108-27).
Plaintiff further alleges that the individual Defendants continued with the Plan *1373 during the state criminal proceedings, when they: (7) tampered with evidence; (8) omitted exculpatory information; (9) provided false deposition and trial testimony; (10) refused to fulfill the crime lab's request for a sample of Plaintiff's blood; and (11) failed to advise Plaintiff's attorney of the crime lab's request for Plaintiff's blood or its analysis of blood splatter evidence found in the bathroom of the home. (See id. ¶¶ 74, 77-80, 124, 128, 131, 132, 135-39, 150-53.)
4. Plaintiff's Claims
Against the City, Plaintiff asserts two § 1983 claims for violations of his Fourth and Fourteenth Amendment rights: (1) "false arrest and unreasonable seizure" (id. ¶¶ 169-77 (Count I ) ); and (2) "unreasonable search" of Plaintiff's home (id. ¶¶ 178-87 (Count II ) ). Plaintiff also asserts three state-law claims against the City: (1) false arrest (id. ¶¶ 349-53 (Count XVIII ) );[3] (2) malicious prosecution (id. ¶¶ 410-19 (Count XXVI ); and (3) intentional infliction of emotional distress ("IIED ") (id. ¶¶ 501-12 (Counts XXXV ) ).
B. The City's Motion to Dismiss
The City then sought to dismiss Counts I (false arrest under § 1983 ), II (unlawful search under § 1983 ), XVIII (false arrest), XXVI (malicious prosecution), and XXXV (IIED) for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (Doc. 128 ("Motion ").) This Court granted the Motion,[4] finding in relevant part that: (1) Plaintiff's § 1983 false arrest and unlawful search claims against the City failed because the officers involved in the alleged false arrest, including Chief Manley, were entitled to qualified immunity based on the existence of arguable probable cause and because Plaintiff did not allege the existence of a custom, policy, or practice on the part of the APD to show municipal liability under Monell (Doc. 133, pp. 16-18); (2) Plaintiff's state-law claims for malicious prosecution and unlawful arrest failed because "probable cause existed for Plaintiff's arrest" (id. at 18); and (3) Plaintiff's state-law IIED claim failed because it rested on the misconduct of individual officers and, pursuant to Florida Statute § 768.28, the City cannot be held liable (id. at 20-21). As a result, the Court dismissed with prejudice all of Plaintiff's claims against the City for failure to state a claim. (Id. at 21.)
C. Appeal
Plaintiff appealed the MTD Order to the Eleventh Circuit, arguing that the Court erred in dismissing his claims against the City. (Doc. 168); see also Davis , 734 F. App'x at 618. Specifically, Plaintiff "argue[d] that the court failed to consider his allegations that Manley, as the City's Chief of Police, was a final policymaker for purposes of Monell liability and that the court erroneously hinged the dismissal of his false arrest and malicious prosecution claims on the officers' arguable probable cause." Davis , 734 F. App'x at 618-19. On *1374 review, the Eleventh Circuit: (1) remanded Plaintiff's § 1983 unlawful search claim, finding that this Court erred in failing to consider Chief Manley's status as a final policymaker and, accordingly, that Plaintiff could pursue his claim against the City for the unconstitutional search of his home; (2) remanded his § 1983 and state-law false arrest claims, directing this Court to determine whether actual probable cause existed to arrest Plaintiff in light of Florida's "Stand Your Ground" law; and (3) affirmed the dismissal of Davis's state-law malicious prosecution claim. Id. at 619-23.[5]
Thus, the Complaint as reconfigured following the MTD Order and Opinion now retains Plaintiff's § 1983 unlawful search claim against the City and Plaintiff's § 1983 and state-law false arrest claims against the City. So the Court must determine, as instructed by the Eleventh Circuit, whether Plaintiff's false arrest claims survive.[6]
II. LEGAL STANDARDS
In federal court, a viable pleading must contain "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a complaint "fails to state a claim to relief that is plausible on its face," the defendant may seek dismissal of the complaint under Rule 12(b)(6). Ashcroft v. Iqbal , 556 U.S. 662, 672, 678-79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In resolving a pleading challenge, courts consider only the complaint, written instruments attached to the complaint as exhibits, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd. , 551 U.S. 308, 323, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). Courts also must accept the truth of all well-pled factual allegations-but not legal conclusions. Tellabs , 551 U.S. at 323, 127 S.Ct. 2499. After disregarding allegations that "are not entitled to the assumption of truth," courts must determine whether the complaint includes "factual content" sufficient to "draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal , 556 U.S. at 679, 129 S.Ct. 1937 (citing Bell Atl. Corp. v. Twombly , 550 U.S. 544, 555-56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ).
III. ANALYSIS
In the Complaint, Plaintiff alleges that the City violated his rights under the Fourth Amendment and Florida law when he was arrested for the murder of his son without probable cause to believe he had engaged in an unlawful use of force. (Doc. 122, ¶¶ 169-77, 349-53.) Specifically, he asserts that there was no probable cause to arrest him for First Degree Murder because he acted in self-defense as the victim of a domestic violence incident. (Id. ¶ 350.) In response, the City argues that it had actual probable cause in effectuating Plaintiff's *1375 arrest.[7] (Doc. 173, pp. 3-4; see also Doc. 128, pp. 6-9.)
For Plaintiff's false arrest claims to withstand a 12(b)(6) motion, his Complaint must include plausible allegations that a law enforcement officer effectuated an arrest in the face of facts and circumstances that would lead a reasonable police officer to conclude that the conduct was not unlawful. See Lee v. Ferraro , 284 F.3d 1188, 1195 (11th Cir. 2002). The probable cause determination is a highly contextual, fact-specific determination based on all the known facts at the scene. See id. An officer cannot "cherry pick" those facts that support a violation and ignore those that are exculpatory. See Cozzi v. City of Birmingham , 892 F.3d 1288, 1294 (11th Cir. 2018). "Arrest them all and let the system sort them out" may work on a bumper sticker, but it hardly passes constitutional muster.
Actual probable cause exists "when 'the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.' " Lee , 284 F.3d at 1195 (quoting Rankin v. Evans , 133 F.3d 1425, 1435 (11th Cir. 1998) ); see also Marx v. Gumbinner , 905 F.2d 1503, 1506 (11th Cir. 1990) ("Probable cause does not require overwhelmingly convincing evidence, but only 'reasonably trustworthy information' ...." (quoting Beck v. Ohio , 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) ) ). The arrest, to be lawful, "must be objectively reasonable based on the totality of the circumstances." Lee , 284 F.3d at 1195 (citing Rankin , 133 F.3d at 1435 ); see also Williams v. City of Homestead , 206 F. App'x 886, 888 (11th Cir. 2006)[8] ("The subjective intent of the officer is immaterial; we are to consider the facts objectively." (citing Whren v. United States , 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ) ).
"An arresting officer is required to conduct a reasonable investigation to establish probable cause." See Rankin , 133 F.3d at 1435-36 (citations omitted). "Importantly, in evaluating probable cause, an officer may not 'unreasonably disregard[ ] certain pieces of evidence' by 'choos[ing] to ignore information that has been offered to him or her' or 'elect[ing] not to obtain easily discoverable facts' that might tend to exculpate a suspect." Cozzi , 892 F.3d at 1294 (alterations in original) (quoting Kingsland v. City of Miami , 382 F.3d 1220, 1229, 1233 (11th Cir. 2004) ). Additionally, "the officer [may not] conduct an investigation in a biased fashion." Kingsland , 382 F.3d at 1229. In other words, officers may not "turn a blind eye to exculpatory information that *1376 is available to them, and instead support their actions on selected facts they chose to focus upon." Id. at 1228 ; see also Kuehl v. Burtis , 173 F.3d 646, 650 (8th Cir. 1999) ("[P]robable cause does not exist when a 'minimal further investigation' would have exonerated the suspect." (citations omitted) ); BeVier v. Hucal , 806 F.2d 123, 128 (7th Cir. 1986) ("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest.").
But an officer "is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." Kingsland , 382 F.3d at 1229 (quoting Ricciuti v. N.Y.C. Transit Auth. , 124 F.3d 123, 128 (2d Cir. 1997) ); see also Rankin , 133 F.3d at 1436 (finding that "[a]n officer ... need not take 'every conceivable step ... at whatever cost, to eliminate the possibility of convicting an innocent person.' " (quoting Tillman v. Coley , 886 F.2d 317, 321 (11th Cir. 1989) ) ). "In deciding whether probable cause exists, an officer is 'not required to sift through conflicting evidence or resolve issues of credibility, so long as the totality of the circumstances present a sufficient basis for believing that an offense has been committed.' " Ermini v. Scott , 249 F.Supp.3d 1253, 1271 (M.D. Fla. 2017). Thus, "[t]he constitution does not guarantee that only the guilty will be arrested." City of Homestead , 206 F. App'x at 889 (quoting Baker v. McCollan , 443 U.S. 137, 145, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) ).
The probable cause calculus is more complicated when an affirmative defense has been asserted. Under those circumstances, "a police officer should consider a suspect's explanation in evaluating the existence of probable cause," but "he 'is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause.' " Id. at 888-89 (quoting Criss v. City of Kent , 867 F.2d 259, 263 (6th Cir. 1988) ). Although "an arresting officer [generally] does not have to consider the validity of any possible defense," there is an exception "when the arresting officer actually has knowledge of facts and circumstances conclusively establishing an affirmative defense." Williams v. Sirmons , 307 F. App'x 354, 358 (11th Cir. 2009) (citations omitted). As a result, the officer "must consider all facts and circumstances within that officer's knowledge, including facts and circumstances conclusively establishing an affirmative defense." Id. at 359. But it is only when "an officer has knowledge of facts and circumstances which conclusively establish an affirmative defense, [that] he or she lacks probable cause to arrest, even when the facts and circumstances establish that the person meets all elements of the offense." Id. (emphasis added).
To those considerations, Florida's Stand Your Ground law, Florida Statutes §§ 776.012 and 776.032, adds another layer to the probable cause analysis. Under Florida's Stand Your Ground law, "[a] person is justified in using ... deadly force if he or she reasonably believes that using ... such force is necessary to prevent imminent death or great bodily harm to himself." Fla. Stat. § 776.012(2). As a consequence, an officer "may not arrest [a] person for using ... force unless [the officer] determines that there is probable cause that the force that was used ... was unlawful." Id. § 776.032(2). As noted by the Eleventh Circuit, " Section 776.032(1) expressly grants defendants a substantive right to not be arrested, detained, charged, or prosecuted as a result of the use of legally justified force."
*1377 Davis , 734 F. App'x at 622 (quoting Dennis v. State , 51 So.3d 456, 462 (Fla. 2010) ).[9]
Here, the question the Court must resolve is whether it violated the Fourth Amendment when law enforcement officers arrested Plaintiff, a homicide suspect, after they were presented with facts and circumstances suggesting the homicide was a justifiable use of deadly force under the Florida Stand Your Ground law. More to the point, procedurally, the question on the motion to dismiss is whether Plaintiff's plausible allegations, taken as true, sufficiently allege an absence of probable cause and, consequently, a Fourth Amendment violation.
"[W]hether an officer possesses probable cause ... depends on the elements of the alleged crime and the operative fact pattern." Brown v. City of Huntsville, Ala. , 608 F.3d 724, 735 (11th Cir. 2010) (citations omitted); see also Williams , 307 F. App'x at 358. In this case, Plaintiff was arrested for either first degree murder or attempted first degree murder. (Doc. 122, ¶¶ 96-97.) Under Florida law, first degree murder is "[t]he unlawful killing of a human being ... [w]hen perpetrated from a premeditated design to effect the death of the person killed ...." Fla. Stat. § 782.04(1)(a)(1). "A person who attempts to commit an offense prohibited by law and in such attempt does any act toward the commission of such offense ... commits the offense of criminal attempt." Fla. Stat. § 777.04(1). Notably, "[t]he validity of an arrest does not turn on the offense announced by the officer at the time of the arrest," Bailey v. Bd. of Cty. Comm'rs of Alachua Cty. , 956 F.2d 1112, 1119 n.4 (11th Cir. 1992), and "[n]o officer has a duty to prove every element of a crime before making an arrest," as "[p]olice officers are not expected to be lawyers or prosecutors." Jordan v. Mosley , 487 F.3d 1350, 1355 (11th Cir. 2007) (quoting Scarbrough v. Myles , 245 F.3d 1299, 1303 n.8 (11th Cir. 2001) ). Rather, "[p]robable cause exists where the facts and totality of the circumstances ... are 'sufficient to cause a person of reasonabl[e] caution to believe an offense has been ... committed.' " Parker v. Allen , 565 F.3d 1258, 1289 (11th Cir. 2009) (emphasis added) (quoting United States v. Jimenez , 780 F.2d 975, 978 (11th Cir. 1986) (per curiam) ); see also Lee , 284 F.3d at 1195.
The City argues that all the elements of a crime warranting Plaintiff's arrest were satisfied by the fact that when officers arrived at the scene in response to the 9-1-1 call, they found Plaintiff lying on top of his wounded son, with a gun in his pocket, and Plaintiff admitted that he fired the shot. (Doc. 128, p. 7; Doc. 173, p. 4 (citing Doc. 122, ¶¶ 45, 48, 50, 51, 54, 55, 56, 97).) Faced with this, the probable cause calculus seems simple-based on the totality of the circumstances it is objectively reasonable to believe that Plaintiff committed a *1378 crime. See Lee , 284 F.3d at 1195. But the officers must do more than establish that Plaintiff's actions satisfied "the elements of the offense," Williams , 307 F. App'x at 358, including taking into account Plaintiff's proffered explanation or defense. See City of Homestead , 206 F. App'x at 888-89 ; cf. Ermini , 249 F.Supp.3d at 1273 (noting that law enforcement officers on the scene were not required to credit a person's justification for the use of force for probable cause purposes).
So difficulty arises when the Court, as it must, credits Plaintiff's allegations regarding the justification for his use of force: that Chief Manley found Plaintiff "lying on top of his son, unable to move because of his injured knees" with "severe, visible bruises and contusions all over his face resulting from the attack from his son" and that Plaintiff told Officer Creaser that he shot Timmy "because my son beat me up and kept coming at me." (Doc. 122, ¶¶ 48, 49, 51.) Moreover, Plaintiff alleges that all of Chief Manley's actions surrounding his arrest were motivated by ill will and animus toward him. (See id. ) Still, accepting those allegations as true does not necessarily mean the officers lacked probable cause to arrest him. Unless it can be said that the facts known to the officers conclusively established the justification for the use of deadly force so as to negate probable cause for the arrest, then his arrest is not constitutionally unreasonable. See Williams , 307 F. App'x at 359. The facts do not permit the Court to say so here. It is certainly true that police officers have discretion to arrest or not arrest either now, or later. Enactment of the "Stand Your Ground" law may have created a "pause" button for law enforcement to consider additional facts in the exercise of their discretion to delay or defer arrest, but it does not create a constitutional violation for going the other way when the viability of the defense cannot be conclusively established at the scene.
Taking all the facts alleged in the Complaint as true, Plaintiff's plausible, non-conclusory allegations do not establish that Chief Manley or any other officers possessed knowledge of facts or circumstances "conclusively establishing" that Plaintiff was justified in shooting his son. See Williams , 307 F. App'x at 358-59 ; see also City of Homestead , 206 F. App'x at 888-89. So, the Court finds that Plaintiff failed to allege a plausible claim for false arrest.
Probable cause hinges on all the facts known to the officer, not mere assertions of justification. See Williams , 307 F. App'x at 358. One case with compelling video footage and eyewitness testimony to support a claim of justified use of deadly force is instructive. In Drew v. Shouse , the court considered the facts known to the officer ("Shouse ") when she arrested the plaintiff ("Drew ") for shooting another individual ("Davis ") following a violent, video-recorded altercation during which Davis repeatedly punched Drew. No. 3:17-cv-991-J-34JBT, 2018 WL 3930117, at *2-3 (M.D. Fla. Aug. 16, 2018). Ultimately, the court dismissed the false arrest claim in light of a qualified immunity defense because the plaintiff failed to show that no arguable probable cause existed to arrest him. Id. at *9-12.[10] The court noted that the arresting *1379 officer interacted with several witnesses and Drew "who asserted that [he] acted in self-defense" and viewed a video recording without audio that "depicts a rapidly intensifying conflict between Drew and Davis, beginning first with heated words, then escalating to Davis striking Drew, and finally culminating with Drew shooting Davis in the face." Id. at *10. Nevertheless, the court dismissed Drew's false arrest claim because without more "a reasonable officer in the same circumstances as Shouse could have concluded that she lacked sufficient facts to conclusively determine that Drew was justified in shooting Davis." Id.
Plaintiff here has far less weighing in his favor. As in Drew , it is what Chief Manley knew that matters. Plaintiff's lengthy and detailed Complaint conspicuously does not plausibly allege that Chief Manley possessed "knowledge of facts or circumstances conclusively establishing" that Plaintiff's use of force was not unlawful. Williams , 307 F. App'x at 358. Rather, the Complaint alleges this about what Chief Manley potentially knew: (1) police responded to a 9-1-1 call in which Mrs. Davis said that Plaintiff had a confrontation with Timmy and that she believed Plaintiff had shot; (2) when Chief Manley arrived, Plaintiff had a bruised and swollen face and injuries to his knees, but Timmy was suffering from gunshot wounds ; (3) Plaintiff, who was lying on top of Timmy, admitted to shooting Timmy although he said it was because "my son beat me up and kept coming at me"; (4) Plaintiff had the gun he used to shoot Timmy inside the front pocket of his pants; and (5) when Plaintiff was handcuffed to remove the gun from his pocket, Timmy stated, "Get away from my daddy and leave my daddy alone!" (Doc. 122, ¶¶ 45, 48-57.) Importantly, the Complaint also alleges that there were no eye witnesses to the actual shooting. (Id. ¶ 46.)
What is more, the Complaint does not sufficiently allege that Chief Manley disregarded evidence, chose to ignore information offered to him, or elected not to obtain easily discoverable facts that would help him clarify whether Plaintiff was entitled to immunity from arrest under Florida's Stand Your Ground law. See Cozzi , 892 F.3d at 1294. To the contrary, Plaintiff's Complaint specifically alleges that after he reiterated to the officers that he shot in response to the attack by Timmy, Chief Manley noticed cameras in the garage where the shooting occurred and inquired as to whether they worked and were able to record. (Id. ¶¶ 61, 65.) Plaintiff's Complaint then asserts that Plaintiff told Chief Manley that they did not record. (Id. ¶ 65.) So in the absence of allegations of eye witnesses to the shooting, the Complaint fails to reveal that there was more Chief Manley could have done to obtain easily available information conclusively establishing that Plaintiff's use of force was not unlawful. See Williams , 307 F. App'x at 359. With that, Plaintiff has failed to show that Chief Manley lacked actual probable cause to arrest him based on the allegations of facts known to Chief Manley at the time of arrest.
To be sure, Plaintiff does also allege in the Complaint that Chief Manley failed to conduct a "meaningful" reasonable investigation into his self-defense claim to determine if probable cause existed prior to arresting Plaintiff, which to him should have included interviewing witnesses *1380 and parties involved, searching the home for evidence upon obtaining a valid warrant, initiating the standard domestic violence procedures, and conducting a "Stand Your Ground" investigation (see Doc. 122, ¶¶ 69-72, 99-102)-an investigation that would largely turn on credibility determinations of statements made by parties and witnesses to establish the reasonableness of a seizure or arrest for Fourth Amendment purposes. But such is a strain the limits of the Fourth Amendment won't bear. See, e.g., Rankin , 133 F.3d at 1435-36 ; Kingsland , 382 F.3d at 1229 ; Ermini , 249 F.Supp.3d at 1271. Notwithstanding what result might be obtained upon the assertion of the affirmative defense of justified force pursuant to Florida's Stand Your Ground law further down the road of a criminal prosecution, the defense was not conclusively established at the time of the arrest to negate probable cause for Fourth Amendment purposes. See Williams , 307 F. App'x at 359. And even if Chief Manley had conducted the investigation Plaintiff contends was required, the Complaint fails to include allegations that any of those steps would have-or even could have-conclusively established the defense of justified force in the absence of eyewitnesses to or recordings of the shooting. Thus, as it stands, Plaintiff seeks more than the law requires for a constitutional arrest.[11]
Based on the allegations in the Complaint surrounding Plaintiff's witness-less fatal shooting of his son, even in light of Florida's Stand Your Ground law, the Court finds that this is one of the many cases in which "it would be impossible for law enforcement to secure a judicial immunity determination prior to arresting an individual suspected of killing or causing bodily harm to another (or attempting to do so)." Kumar v. Patel , 227 So.3d 557, 559 (Fla. 2017).[12] No matter that the Stand Your Ground law has created considerable procedural difficulties in implementation to afford the absolute immunity from arrest contemplated by the Florida legislature, see id. , what the law cannot do is expand the limits of the Fourth Amendment to the point of requiring a judicial or law enforcement *1381 conclusive determination of "self-defense" before effectuating an arrest to meet constitutional muster. Without circumstances with clear factual support indicating an unlawful use of deadly force and no witnesses or other easily obtainable evidence to conclusively prove otherwise, the police are not required to collect, evaluate, weigh the evidence and adjudicate the bona fides of the defense prior to making an arrest.[13] That is a bridge too far. Therefore, even under the circumstances alleged in the Complaint, Chief Manley's conduct was "in full accord with the Florida Supreme Court's judicial development of how law enforcement officials should implement Florida Statutes section 776.032." Drew , 2018 WL 3930117, at *12 ; see id. at *11 ("[I]n many situations an officer may have enough information to lead her to reasonably conclude a crime has been committed, but not enough information to conclusively determine that the criminal suspect was acting in self-defense. In such settings, Florida law guides that the officer should arrest the suspect, and an immunity determination would be made later in the judicial process." (citing Kumar , 227 So.3d at 560 ) ).
As Judge Steele and Judge Howard have recently observed, while the enactment of Florida's Stand Your Ground law "substantially altered the law governing justifiable use of force by abrogating the common law duty to retreat before resorting to deadly force in self-defense" and granting immunity to those who prove entitlement to the defense by the preponderance of the evidence, this immunity does not negate the existence of probable cause at the time of this arrest. See Ermini , 249 F.Supp.3d at 1273 ; see also Drew , 2018 WL 3930117, at *4-12. Plaintiff's plausible allegations, construed most favorably and accepted as true, demonstrate the presence of actual probable cause for his arrest. Actual probable cause is not conclusively negated by the totality of the circumstances. Indeed, it is difficult to imagine a factual backdrop that would permit the police to conclusively establish the sufficiency of the defense so as to negate actual probable cause in the context of a false arrest claim, short of witnessing the event themselves. After all, even eyewitness testimony can be, and often is, unreliable. The credibility of witnesses is untested by the crucible of cross examination at the scene. Perhaps there is a set of facts that would suffice, but they do not exist here. So, the false arrest claims against the City alleged in Counts I and XVIII of the Complaint are due to be dismissed with prejudice.
IV. CONCLUSION
Accordingly, it is ORDERED AND ADJUDGED as follows:
*1382 1. Defendant City of Apopka's Motion to Dismiss Plaintiff's Third Amended Complaint (Doc. 128) is GRANTED IN PART AND DENIED IN PART:
a. Counts I, XVIII, XXVI, and XXXV are dismissed with prejudice for failure to state a claim.
b. In all other respects, the Motion is DENIED.
2. Defendant City of Apopka's Motion for Clarification Regarding Probable Cause and Supplemental Motion to Dismiss Plaintiff's False Arrest Claims (Doc. 173) is GRANTED IN PART AND DENIED IN PART:
a. To the extent the Motion requests the Court to dismiss Counts I and XVIII with prejudice, the Motion is GRANTED.
b. To the extent the Motion requests the Court to reject the notion that Florida's Stand Your Ground law upsets the existence of actual probable cause for Plaintiff's arrest, the Motion is GRANTED.
c. In all other respects, the Motion is DENIED.
DONE AND ORDERED in Chambers in Orlando, Florida, on December 21, 2018.

On appeal the Eleventh Circuit noted that "[t]he district court's order granting in part and denying in part the City and individual officers' motion to dismiss thoroughly sets forth the facts as alleged in Davis's third amended complaint." Davis , 734 F. App'x at 617 n.2. Accordingly, here the Court includes the facts from its MTD Order (Doc. 133) that are relevant to the Court's correction of its previous errors as directed by the Eleventh Circuit.

Plaintiff alleges that his arrest affidavit indicated that he was "arrested for First Degree Murder" when he was still at his home, before any witnesses were interviewed, and while Timmy was still alive. (See Doc. 122, ¶¶ 91-93, 95-97, 100; see also id. ¶ 132.)

Plaintiff advises that he intended to designate Count XVIII as a state-law claim against the City for false arrest, but that Count did not appear in the Complaint during Plaintiff's scanning process. (See Doc. 130, p. 19.) The basis of Plaintiff's claim is evident from the allegations contained in the Complaint. (See Doc. 122, p. 64.) As such, the Court will follow the parties' lead and construe Count XVIII as a claim against the City for false arrest. (See, e.g. , Doc. 129, p. 3.)

The MTD Order also addressed a motion to dismiss filed by other Defendants in this case (see Doc. 133), but the City is the only Defendant that was a party to the appeal. Davis , 734 F. App'x at 617 n.1. Thus, the Court recounts its rulings on only those claims against the City.

Regarding Plaintiff's IIED claim against the City, the Eleventh Circuit stated only, "The district court dismissed another claim against the City, one for intentional infliction of emotional distress, on the ground that under Florida law the City is immune in actions arising out of the malicious acts of its police officers." Davis , 734 F. App'x at 622 n.9.

Following the Eleventh Circuit's Opinion, the City filed a Motion for Clarification Regarding Probable Cause and Supplemental Motion to Dismiss Plaintiff's False Arrest Claims (Doc. 173), to which Plaintiff responded (Doc. 187). Throughout these filings, the parties dispute in detail the existence of actual probable cause and the impact, if any, of Florida's Stand Your Ground law on that determination. (See Docs. 173, 187.) So the Court considered those arguments as well as the arguments in the original motion to dismiss (Doc. 128) and response (Doc. 130).

Previously, the Court applied to the City the arguable probable cause standard to determine if the arrest was unconstitutional. (Doc. 133, pp. 12-15, 18.) That standard was incorrect for the City because it only applies to individual officers asserting a qualified immunity defense. (Id. at 12-15.) In applying that standard, the Court found that arguable probable cause was present. (See id. ) But such finding is not translatable to the City, as it is a lower standard than actual probable cause. See Lee v. Ferraro , 284 F.3d 1188, 1195 (11th Cir. 2002) (distinguishing actual and arguable probable cause); see also Hunter v. Bryant , 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (noting that arguable probable cause "gives ample room for mistaken judgments" and affords protection from liability for "all but the plainly incompetent or those who knowingly violate the law" (quoting Malley v. Briggs , 475 U.S. 335, 343, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) ) ).

While unpublished opinions are not binding precedent, they may be considered as persuasive authority. See 11th Cir. R. 36-2 ; see also United States v. Almedina , 686 F.3d 1312, 1316 n.1 (11th Cir. 2012).

Of course this is easier said than done, as the Court must now tease out how this law impacts the probable cause calculus. If, as the City contends, deciding whether the facts support a defense of justified force under the Stand Your Ground law for probable cause purposes is a post-arrest evidentiary analysis (see Doc. 173, pp. 5-9), then the statutory protection against being "arrested, detained, or charged" as a result of the use of legally justified force would be effectively written out of the statute. See Fla. Stat. § 776.032(1). Additionally, while the City relies on Dennis v. State , 51 So.3d 456 (Fla. 2010), to propose that the availability of the defense in the context of a criminal prosecution is a "post-arrest, post-charging procedural mechanism" to determine a defendant's immunity pre-trial (see Doc. 173, pp. 1, 5-6), it sheds little light on the issue of whether the availability of the defense is part of the "totality of the circumstances" informing the probable cause calculus at the time of arrest. See Lee , 284 F.3d at 1195.

While admittedly determined against the backdrop of a qualified immunity analysis and the arguable probable cause standard as opposed to the actual probable cause standard, in Drew the court stated:
Here, Drew alleges that Davis "physically, repeatedly, and forcefully" struck Drew "with closed fists [on] his face and body." In response, Drew "pulled a gun that he had been possessing in a side-holster and fired one (1) shot into Mr. Davis' face." Based on these initial facts alone, a reasonable officer in the same circumstances as Shouse could have concluded that probable cause existed to arrest Drew for attempted murder. When Drew shot Davis in the face, Drew engaged in an "imminently dangerous [act] to another, and evinced a depraved mind regardless of human life ...."
Drew , 2018 WL 3930117, at *9 (alteration in original) (citations omitted).

While Plaintiff undoubtedly and understandably wanted a more thorough investigation into his claim of self-defense prior to arrest, the Court must also consider that probable cause for an arrest "is a fluctuating concept; its existence depends upon 'factual and practical considerations of everyday life.' " BeVier v. Hucal , 806 F.2d 123, 126 (7th Cir. 1986) (quoting Henry v. United States , 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959) ). Moreover, "probable cause is a function of information and exigency." Id. at 127 ; see also Gramenos v. Jewel Cos., Inc. , 797 F.2d 432, 438 (7th Cir. 1986) ("Probable cause can be a matter of degree, varying with both the need for prompt action and the quality of the information at hand." (citing Illinois v. Gates , 462 U.S. 213, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ) ).

Notably, the Florida Supreme Court goes on to say:
The law is clear that we expect officers to temporarily detain a person encountered under circumstances creating a reasonable suspicion of criminal activity. Then, if there is probable cause to believe that the person committed a felony, law enforcement is authorized to immediately effectuate the arrest ... and should clearly do so when there is probable cause to believe that a person has committed a serious crime of violence against another. Probable cause to arrest for a crime of violence would include probable cause to believe that the suspect was not acting in self-defense; and, suspects will often claim self-defense even when the facts would not appear to support such a claim. This means that in most potential self-defense cases, a post-arrest and post-charging immunity determination, made when a defendant's counsel requests that determination, will be the best that we can do-procedurally-considering the well-established body of law detailing the responsibilities of law enforcement officers, prosecutors, and judges.
Kumar , 227 So.3d at 559-60.

Plaintiff relies heavily on the case of Cozzi for the relatively unremarkable proposition that "in evaluating probable cause, an officer may not 'unreasonably disregard[ ] certain pieces of evidence' by 'choos[ing] to ignore information that has been offered to him or her' or 'elect[ing] not to obtain easily discoverable facts' that might tend to exculpate a suspect." 892 F.3d at 1294 (alterations in original) (quoting Kingsland , 382 F.3d at 1229, 1233 ). But Cozzi is distinguishable in the facts, the standard, and procedural posture. First, the facts in Cozzi , such as the presence or absence of tattoos that distinguished the suspect from the perpetrator, clearly involve "easily verifiable exculpatory information" as opposed to the facts here that implicate credibility determinations or assessments of subjective intent. See id. Second, the examination in Cozzi turned on the less stringent arguable probable cause standard and was a qualified immunity evaluation. See id. at 1293 (noting that "an officer may be entitled to qualified immunity even if there was no actual probable cause for the arrest"). Ultimately, in Cozzi the officer made a mistake that was held to be unreasonable because he failed to consider or act on plainly exculpatory, easily verifiable information. Id. at 1294-98. Those were not the facts here.